**SCSC CORP., formerly known as Schloff Chemical and Supply Company, Respondent,**

v.

**ALLIED MUTUAL INSURANCE COMPANY, as successor in interest to AID Insurance Company, Appellant (C2–93–1408), Respondent (C8–93–1414, C3–93–1630),**

**Tower Insurance Company, Respondent (C2–93–1408), Appellant (C8–93–1414, C3–93–1630).**

Nos. C2–93–1408, C8–93–1414 and C3–93–1630.

Court of Appeals of Minnesota.

April 26, 1994.

Review Granted June 29, 1994.

Thomas C. Mielenhausen, James A. Mennell, Popham, Haik, Schnobrich & Kaufman, Ltd., Minneapolis, for SCSC Corp.

Dale O. Thornsjo, Eric J. Strobel, Peterson & Hektner, Ltd., Minneapolis, for Allied Mut. Ins. Co.

Sean E. Hade, Mary P. Rowe, Jardine, Logan & O'Brien, St. Paul, for Tower Ins. Co.

Considered and decided by ANDERSON, C.J., and NORTON and MULALLY,[*] JJ.

## OPINION

NORTON, Judge.

The insurers of a business that allegedly contaminated the groundwater beneath its property appeal from a judgment, an amended judgment, and an order denying the insurers' motions for a new trial. The insurers allege they are not obligated to defend or indemnify their insured for the costs of cleaning up the groundwater contamination. We affirm the trial court in all respects except its award of enhanced attorney fees.

## FACTS

### SCSC and Perc

Beginning in 1950, Schloff Chemical and Supply Company (SCSC) was a wholesale distributor of cleaning products and supplies to nursing homes, hospitals, and dry cleaners. One of the products SCSC distributed to dry cleaners was a chemical known in the trade as "perc."

Dry cleaners use perc as a substitute for water to clean certain fabrics that would shrink or discolor if washed in water. Perc, which has been in use in the dry cleaning industry for decades, constitutes 90% to 95% of the fluid used for dry cleaning clothes. As a petroleum-based solvent, perc evaporates quickly when exposed to air and will dissolve asphalt over time. The Minnesota Department of Health classifies perc as a volatile organic compound and has set a recommended allowable limit for perc of seven parts per billion in groundwater used for drinking.

In 1975, SCSC moved from near downtown Minneapolis to St. Louis Park. SCSC had two 10,000 gallon tanks for storage of perc built at its St. Louis Park facility. The tanks at the SCSC facility were filled by railroad tank car or, more commonly, by truck transport. A fill pipe at the southwest corner of the SCSC building was used for incoming and outgoing deliveries of perc.

For making deliveries of perc, SCSC had a truck with a 600 gallon tank inside it. To fill the delivery truck, an SCSC warehouse worker would pump perc into the delivery truck's tank through a hose attached to the fill pipe at a rate of about 10 gallons per minute. After the delivery truck tank was filled, the truck driver would uncouple the fill hose and cap the fill pipe. During this process, a five gallon bucket was used to capture any drips or spills of perc. The tanker truck drivers delivering perc to SCSC also used buckets to catch any drips of perc; the perc in the drip buckets was put into a container inside the SCSC warehouse and reclaimed. Because of the cost and the hazardous nature of perc, SCSC employees were trained not to waste it.

### Perc Spills

Occasionally perc spills occurred at the SCSC facility. In the summer of 1977, Frank Marconi, a truck driver for SCSC, was filling the tank in the SCSC delivery truck when the tank overfilled and perc sprayed into Marconi's eyes. Perc continued to flow out of the fill hose for two or three minutes while Marconi was helped inside the SCSC facility to an emergency shower for chemical spills. The perc ran out of the back and side of the truck and through the truck's unsealed floor onto the parking lot. Given a flow rate of 10 gallons per minute, it was estimated that 20 to 30 gallons of perc were spilled in the 1977 incident. Richard Anderson, an SCSC employee who saw the 1977 spill, testified that the perc on the ground covered an

---

[*] Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

area 16 feet long and 2 to 4 feet wide. The perc flowed into a seam in the asphalt along the west property line of the SCSC property. After reaching the seam, Anderson testified, the perc pooled and flowed north. On August 30, 1977, there was a seven-inch rainfall in the Twin Cities area.

In addition to the 1977 spill, there was evidence of other perc spills in various amounts between 1977 and 1989. Because the jury in this case found the 1977 perc spill was the first spill that resulted in groundwater contamination, we need not set forth in detail the facts of the other spills. In February 1989, a perc spill similar to the 1977 spill occurred. The 1989 spill was used to determine the likely effects of the 1977 spill.

### The MPCA Proceedings

On October 26, 1988, the Minnesota Pollution Control Agency (MPCA) sent SCSC a request for information (RFI) that advised Irv Schloff, one of the owners of SCSC, that the MPCA was investigating groundwater contamination by volatile organic compounds near SCSC's St. Louis Park facility. Volatile organic compounds, including perc, had been detected in the groundwater in February 1987.

The RFI included the following question:

To your knowledge, have any spills, leaks, releases, or discharges of virgin or used chemicals occurred at Schloff? If yes, please include the following information:

a. Describe the location(s) of any spills and what was spilled (locate the spills on the building diagram, if necessary).

b. What volume (approximately) of perc or other chemicals or waste was spilled?

c. How much of the spill was recovered?

d. Have any spills discharged directly into Minnehaha Creek?

Dennis Zimmer, SCSC's general manager, responded to the RFI:

A. Drippings have occurred at the southwest corner of the building during filling of tanks. Attaching couplings and hoses during the fill process have caused drips during this process.

B. Volume unknown—since drips have occurred for a period of years in small volume.

C. No indication of volume lost to cause concern to recover drips.

D. No. Our trucks never go near Minnehaha Creek and the berm surrounding our tanks indicate no leaks nor have we ever had above ground leaks from our tanks.

Zimmer did not talk to any other SCSC employees or conduct any investigation before responding to the RFI. He based the response on a single incident that occurred in 1988. SCSC responded to the RFI without consulting an attorney in order to economize. SCSC paid for the costs of cleanup, eventually borrowing $300,000 on a line of credit. Once SCSC was no longer able to borrow money to pay for the cleanup, the MPCA took over payment.

### The Insurance

In October 1989, SCSC's attorney wrote to appellants Allied Mutual Insurance and Tower Insurance company requesting that they defend and indemnify SCSC in the proceedings brought by the MPCA.

Despite repeated communications from SCSC, Allied neither admitted nor denied coverage. During the following months, Allied told SCSC that Allied was investigating the claim. Over a year after first notifying Allied and Tower of the MPCA proceedings, SCSC brought this declaratory judgment action.

Allied had provided primary comprehensive general liability insurance to SCSC from October 1972 through October 10, 1984. Under the terms of the Allied policies, Allied was obligated to pay all sums SCSC became legally obligated to pay as damages because of property damage caused by an occurrence. Allied also had the "right and duty" to defend any suit against SCSC for a covered claim.

The Allied policies defined "property damage" as "physical injury to or destruction of tangible property which occurs during the policy period" and "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily

injury or property damage neither expected nor intended from the standpoint of the insured." The Allied policies contained a qualified pollution exclusion which bars coverage for releases of pollutants that are not sudden and accidental.

Tower provided umbrella liability insurance coverage to SCSC from April 1977 through October 1982. The Tower policies obligated Tower to defend SCSC once the limits of the underlying insurance were exhausted. The Tower policies defined "property damage" and "occurrence" in a manner functionally the same as Allied's policies. In addition, the Tower policies contained a pollution exclusion clause functionally identical to Allied's.

**The Trial**

The case proceeded to a jury trial where SCSC called hydrogeologist Keith Rapp as an expert witness. Rapp testified to his knowledge of the SCSC site, including the underlying soil, his analysis of perc flow rates, and the process of backdating to determine when perc first reached the groundwater. Rapp testified, without objection by Allied or Tower, that, in his opinion, perc from the 1977 spill reached the seam in the parking lot and entered the soil. The seven-inch rain on August 30, 1977, then washed the perc through the soil and into the groundwater, which is only twelve feet below the surface at the SCSC site. Rapp observed the February 1989 spill, which he was told was similar to the 1977 spill, and used this observation to determine that the 1977 spill caused groundwater contamination.

After a three-week trial, the jury determined that the cause of the property damage at the SCSC site was a sudden and accidental release of perc in August 1977. The jury found that SCSC did not expect or intend property damage, that there was no overriding cause of the property damage, and that the property damage was not divisible. The jury further found that neither Allied nor Tower was actually prejudiced by the timing of the notice SCSC had given them. The jury set SCSC's damages at $1,326,-294.41.

Allied and Tower moved for a new trial. SCSC moved for an award of attorney fees incurred in both the declaratory judgment action to establish coverage and the underlying MPCA claim. In addition to the attorney fees actually incurred in the two actions, SCSC sought a multiplier of 1.5, which the trial court granted. Finally, the trial court held that Allied was solely responsible for the defense costs and that SCSC was entitled to prejudgment interest. Allied and Tower have appealed, and SCSC has filed a notice of review.

**ISSUES**

I. Did the trial court err in holding that coverage under the Allied and Tower policies was triggered by property damage, rather than the manifestation or discovery of property damage?

II. Did the trial court err in holding that SCSC was not obligated to prove that the overriding cause of the property damage was a covered cause?

III. Did the trial court err in submitting a special verdict form asking the jury on what date property damage arose?

IV. Did the trial court err in instructing the jury on divisibility of damages?

V. Did the trial court err in holding that the pollution exclusion clause does not bar coverage?

VI. Does the owned property exclusion bar coverage?

VII. Did the trial court err in granting SCSC a directed verdict on SCSC's duty to refrain from voluntarily incurring obligations?

VIII. Is the jury's finding of fact that Allied and Tower were not prejudiced by SCSC's timing of the notice of the MPCA proceedings against SCSC clearly erroneous?

IX. Did the trial court abuse its discretion in permitting SCSC witness Keith Rapp to state his opinions?

X. Did the trial court err in holding Allied's and Tower's policies are triggered vertically?

XI. Did the trial court err in its interpretation of the "all sums" policy language?

XII. Did the trial court err in holding Allied solely responsible for reimbursing SCSC for its defense costs and its attorney fees incurred in the declaratory judgment action?

XIII. Did the trial court err in awarding enhanced attorney fees?

## ANALYSIS

### I. *Trigger*

The trial court held that the proper trigger of coverage under the policies is property damage during the policy period. Tower and Allied contend that the proper trigger of coverage is manifestation of property damage during the policy period. Determining the appropriate trigger of coverage requires interpretation of the policy language in light of the relevant caselaw. On appeal, this court reviews such questions of law de novo. *See Grossman v. American Family Mut. Ins. Co.*, 461 N.W.2d 489, 493 (Minn.App. 1990), *pet. for rev. denied* (Minn. Dec. 20, 1990).

In cases involving long-term exposure to chemicals, Minnesota has adopted the actual injury rule as the trigger of insurance coverage. Under this rule, injury occurs, and insurance coverage is triggered, when property is damaged. *Industrial Steel Container Co. v. Fireman's Fund Ins. Co.*, 399 N.W.2d 156, 159 (Minn.App.1987), *pet. for rev. denied* (Minn. Mar. 18, 1987) (*ISCC*).

Allied and Tower argue that the court in *ISCC* adopted a manifestation theory, even though the court noted the existence of the manifestation rule before stating that it was adopting the actual injury rule. *See id.* (citing *Eagle–Picher Indus. v. Liberty Mut. Ins. Co.*, 682 F.2d 12, 19 (1st Cir.1982), *cert. denied*, 460 U.S. 1028, 103 S.Ct. 1279, 75 L.Ed.2d 500 (1983)). Allied and Tower contend that *ISCC* adopted a manifestation theory because it cited the district court opinion in *American Home Prods. Corp. v. Liberty Mut. Ins. Co.*, 565 F.Supp. 1485 (S.D.N.Y. 1983), *aff'd as modified*, 748 F.2d 760 (2nd Cir.1984) (*AHP*). *See ISCC*, 399 N.W.2d at 159. The *AHP* district court, however, repeatedly rejected the manifestation theory that Allied and Tower claim it adopted:

The manifestation theory refuses to recognize that any bodily injury may have existed prior to the appearance of symptoms or an actual diagnosis. Under this construction, the manifestation theory would be convenient to apply, *but it is inconsistent with the policy language.*

*AHP*, 565 F.Supp. at 1495 (emphasis added). The court further explained:

[A] real but undiscovered injury, proved in retrospect to have existed at the relevant time, would establish coverage, *irrespective of the time the injury became manifest.* * * * [A]n occurrence means something different—and more expansive— than manifestation or discovery.

*Id.* at 1497 (emphasis added).

After rejecting the manifestation theory, the district court in *AHP* ordered the parties to submit a declaratory order encompassing the court's decision. *Id.* at 1513. The court's order for judgment, however, limited the insurer's liability to damages resulting from a diagnosable and compensable injury during the relevant policy period. *AHP*, 748 F.2d at 763–64 n. 1. In affirming, the second circuit stated,

There is no language in the policies that purports to limit coverage only to injuries that become apparent during the policy period, regardless of when the injury actually occurred. Therefore, *we agree with the district court that Liberty's manifestation interpretation is not reasonable.*

*Id.* at 764 (emphasis added). The court of appeals went on to reject the requirement that an "injury in fact" be compensable or diagnosable. *Id.* at 765.

Thus, neither the district court nor the appellate court in *AHP* adopted a manifestation theory. The order signed by the district court in *AHP* was inconsistent with the court's opinion and was modified to conform to the district court's analysis.

As Allied points out, after adopting the actual injury theory as the appropriate trigger of coverage, this court in *ISCC* used the word "manifestation." The court used the term "manifestation" to mean the existence of the actual property damage, rather than

when it became apparent to the injured party. This meaning is demonstrated by the statement, "There can be damage with more than one manifestation." *ISCC,* 399 N.W.2d at 159. Although another word might have eliminated any possible confusion, the use of the term does not affect the court's rejection of the manifestation trigger.

■ In the present case, the event triggering liability on the part of SCSC was the entry of perc into the groundwater. The MPCA's later discovery of the perc in the groundwater did not create liability on the part of SCSC; the liability was created at the time the groundwater was damaged. The trial court properly held that the trigger of liability was the injury in fact, not the later discovery of that injury by the MPCA.

## II. *Overriding Cause*

The jury in the present case found that property damage arose in August 1977 as the result of a sudden and accidental event or events and that there was no overriding cause of the property damage. The jury further found that the property damage is not divisible. Allied argues that the jury's finding of no overriding cause entitles Allied to judgment in its favor because SCSC failed to prove that a covered occurrence was the direct cause of the remediation costs at the SCSC site. We cannot agree.

■ An insured is entitled to recover from an insurer when a cause of the loss is covered by the policy, even though an excluded cause may also have contributed to the loss. *Henning Nelson Constr. Co. v. Fireman's Fund Am. Life Ins. Co.,* 383 N.W.2d 645, 653 (Minn.1986). When no single event can be considered the overriding cause, coverage exists if a covered event is *a* direct cause of the property damage. *Campbell v. Insurance Serv. Agency,* 424 N.W.2d 785, 789 (Minn.App.1988).

■ As the trial court explained, the most likely direct causes of the groundwater contamination in this case were multiple events over a long period of time. In cases involving multiple discharges of pollutants, some, all, or none of the events may be excluded from coverage. *See Sylvester Bros. Dev. Co.*

*v. Great Cent. Ins. Co.,* 480 N.W.2d 368, 374 (Minn.App.1992), *pet. for rev. denied* (Minn. Mar. 26, 1992). If property damage results from a covered cause, the fact that a noncovered cause also contributed to the property damage does not eliminate coverage. *See Waseca Mut. Ins. Co. v. Noska,* 331 N.W.2d 917, 921 (Minn.1983). On the other hand, a finding that property damage arose during Allied's and Tower's coverage periods would not compel the conclusion that the insurers are responsible for all damages arising out of the groundwater contamination extending indefinitely into the future. *See Jostens, Inc. v. CNA Ins./Continental Cas. Co.,* 403 N.W.2d 625, 630 (Minn.1987). To the extent that the damages can be apportioned, SCSC is responsible for property damage that was caused by an event occurring outside of the Tower and Allied policy periods. *Id.* For this reason, the court instructed the jury to determine whether the non-covered causes of the property damage were the overriding cause of the damage.

■ The jury found no overriding cause of the property damage. SCSC was required to establish only that the damage resulted from a covered cause; SCSC was not required to establish that a covered cause was the overriding cause. Once SCSC established a prima facie case of coverage by showing a covered cause of the property damage, the burden shifted to Allied and Tower to prove that the damages resulted from a noncovered cause. *See Boedigheimer v. Taylor,* 287 Minn. 323, 329, 178 N.W.2d 610, 614 (1970); *Anderson v. Connecticut Fire Ins. Co.,* 231 Minn. 469, 478, 43 N.W.2d 807, 813 (1950). They failed to carry this burden.

Allied argues that the jury found no causal connection between a covered occurrence and the costs of cleaning up the groundwater contamination. Allied bases its argument upon its interpretation of the jury's answer to a single question on the special verdict form; Allied makes no reference to the pleadings and record. We reasonably construe the jury's verdict in light of the pleadings and the record. *Pogalz v. Kenna,* 267 Minn. 340, 349, 126 N.W.2d 458, 464 (1964). In context, the verdict establishes that a

sudden and accidental spill in August 1977 caused the groundwater contamination. All of the other perc spills combined did not override the effect of the August 1977 spill.

### III. *Single Date*

Tower argues the trial court erred in submitting a special verdict form that asked the jury to determine the one date on which property damage arose. The court asked the jury whether property damage arose at the SCSC site before October 10, 1984 and, if so, on what date (month and year) property damage arose.

■ The trial court has the duty to define the issues for the jury. *Daugherty v. May Bros. Co.*, 265 Minn. 310, 320, 121 N.W.2d 594, 601 (1963). "Special verdict questions should be questions of either evidentiary or ultimate facts." *Gravley v. Sea Gull Marine*, 269 N.W.2d 896, 900 (Minn. 1978). The trial court has broad discretion regarding the form and substance of the questions asked. *Persgard v. Gordon C. Carroll & Sons*, 362 N.W.2d 377, 379 (Minn. App.1985), *pet. for rev. denied* (Minn. Apr. 26, 1985).

■ In the trial court's opinion, any prejudice to Tower resulting from the jury's being asked to give a single date on which property damage arose was cured by allowing the jury to find that the damage was divisible. Based on the record, we agree. If the jury had found the property damage divisible, the jury would have assigned a percentage to each policy period reflecting the damage attributable to that timeframe. The jury, however, found the property damage was not divisible. The evidence supports a determination that perc entered the groundwater in August 1977 and sporadically after that time, but that the damage caused by the initial entry of perc into the groundwater could not be separated from any later additions. Furthermore, the record contains no evidence that the later additions of perc to the groundwater increased the clean-up costs. We hold the trial court did not abuse its discretion in determining the form of Question 2.

### IV. *Divisibility*

Tower argues that the trial court's instruction on divisibility of damages improperly placed the burden of showing divisibility on the insurers and improperly required allocation by a precise formula.

#### A. *Burden*

■ To establish its prima facie case, SCSC had the burden of proving the property damage was a covered occurrence during the policy period. Allied and Tower sought to limit their liability by showing property damage outside the policy period. The trial court properly placed the burden of showing divisibility on Allied and Tower. *See Holman v. All Nation Ins. Co.*, 288 N.W.2d 244, 248 (Minn.1980) (party who must allege a particular fact has burden of proving it); *Texas Commerce Bank v. Olson*, 416 N.W.2d 456, 461 (Minn.App.1987) (burden of proof is on party who will benefit from establishing that fact).

#### B. *Precise Formula*

■ In selecting the language of jury instructions, trial courts have "considerable latitude," so long as the charge correctly states the substantive law. *Alholm v. Wilt*, 394 N.W.2d 488, 490 (Minn.1986) (quoting *Cameron v. Evans*, 241 Minn. 200, 208, 62 N.W.2d 793, 798 (1954)). Trial courts also have broad discretion in determining whether a specific instruction is proper. *Id.* Upon review, we read the instructions as a whole, in light of the evidence in the case, in order to determine whether the instruction was proper. *Bauer v. Markovich*, 484 N.W.2d 437, 438 (Minn.App.1992).

The trial court included the precise formula requirement in the jury instructions in order to prevent the jury from basing an allocation on speculation and conjecture. Tower's proposed jury instruction did not provide any guidance on how the jury would allocate damages. We find no abuse of discretion by the trial court in its formulation of the jury instruction on divisibility.

### V. *Pollution Exclusion*

■ Tower argues that the pollution exclusion clause bars coverage and that SCSC

has not established that the sudden and accidental exception to the exclusion applies. SCSC bears the burden of showing the exception applies. *Dakhue Landfill v. Travelers Indemn. Co.*, 508 N.W.2d 798, 802–03 (Minn.App.1993).

The exception to the pollution exclusion clause refers to a sudden and accidental "discharge, dispersal, release or escape" of pollutants. These terms connote "the issuance of a substance from a state of containment." *Sylvester Bros.*, 480 N.W.2d at 374. Tower argues that the release of perc into the groundwater could not have been sudden, as a matter of law. We disagree.

It is the suddenness of the release of perc from a state of containment, not the length of time that elapses before the damage is discovered, that determines whether the sudden and accidental exception to the pollution exclusion applies. *See Gridley Assocs. v. Transamerica Ins. Co.*, 828 P.2d 524, 527 (Utah App.1992). In *Gridley,* a pipe connecting a gasoline storage tank with gasoline dispensers broke; the uncontroverted evidence established that the pipe had broken suddenly. The break occurred in November 1985 and was not discovered until February 1986. Because the break in the line caused a sudden discharge of gasoline, the fact that the damage was not discovered until sometime later did not affect the applicability of the exception to the pollution exclusion. *Id.*

In the present case, the jury found that there was a sudden and accidental release of perc that caused property damage in August 1977. Although the property damage was not discovered until many years later, a sudden and accidental release of pollutants had caused the property damage.

In the trial court, Allied and Tower took the position that the relevant "release" was the escape from confinement of the perc, rather than the resulting property damage. Tower argued that since the present case does not involve a landfill, the relevant discharge of perc was the discharge "from a hose, tank truck or other place of containment." The trial court agreed. Allied and Tower cannot complain that the trial court accepted their argument. *See Wolner v. Mahaska Indus.*, 325 N.W.2d 39, 42 (Minn.1982).

Tower relies on several cases involving landfills wherein this court has considered what constitutes the "release" of a substance into the environment. *See Dakhue,* 508 N.W.2d at 803; *Krawczewski v. Western Cas. & Sur. Co.*, 506 N.W.2d 656, 659 (Minn.App. 1993), *pet. for rev. denied* (Minn. Nov. 23, 1993); *Sylvester Bros.*, 480 N.W.2d at 374. Landfills were built on the assumption that the ground under the waste mass would be able to hold pollutants in suspension above the groundwater. *See Dakhue,* 508 N.W.2d at 800. For this reason, the relevant release was deemed to occur when pollutants leaked out of the soil under a landfill and into the groundwater. *See Sylvester Bros.*, 480 N.W.2d at 373–74. These cases are distinguishable. This case does not involve a landfill and SCSC made no attempt to store perc, suspended in the soil, above groundwater.

Tower argues the jury instruction did not adequately inform the jury that SCSC could be held responsible for property damage caused by the conduct of third parties, such as drivers of trucks delivering perc to SCSC.[1] The court instructed the jury that a discharge would be considered accidental if a reasonable actor did not expect or have reason to expect that the discharge would occur. The court further instructed that discharges by SCSC or its agents "during the normal course of business" would not be "accidental." The court incorporated the substance of Allied's and Tower's proposed jury instruction in this charge.

Considering the jury instruction as a whole, the trial court did not abuse its discre-

---

**1.** Only amicus IELA has presented any argument in its brief on this issue. The purpose of an amicus brief is to give a nonadversarial explanation of the reasons a particular rule should be adopted in a particular case. 3 Eric J. Magnuson, et al., *Minnesota Practice* § 129.3 (2d ed. 1985). An amicus brief should not argue that a particular party should prevail. *Id.* Tower has stated in a footnote that it "maintains its objection" to the instruction at issue. An assertion of error unsupported by argument or authorities is generally deemed to be waived. *Schoepke v. Alexander Smith & Sons Carpet Co.*, 290 Minn. 518, 519–20, 187 N.W.2d 133, 135 (1971). Given the importance of this case, we will address the issue.

tion in its choice of language to inform the jury that SCSC could be held responsible for the conduct of third parties.

### VI. Owned Property Exclusion

Tower asserts the trial court erred in concluding that the owned property exclusion does not bar coverage.[2]

■ The owned property exclusion clearly does not exclude costs incurred to remedy the groundwater contamination by cleaning the insured's property. *Northern States Power Co. v. St. Paul Fire & Marine Ins. Co.*, 504 N.W.2d 240, 246 (Minn.App. 1993), *pet. for rev. granted to consider different issue* (Minn. Nov. 16, 1993) (*NSP*). The owned property exclusion does bar costs for cleaning up soil contamination that is limited exclusively to the insured's property, however. *United States v. Conservation Chem. Co.*, 653 F.Supp. 152, 200 (W.D.Mo.1986). Which costs are covered and which are excluded is a question for the jury. *NSP*, 504 N.W.2d at 246. In this case, uncontradicted testimony established that the entire cleanup, including cleanup of the soil at the SCSC site, is necessary to remedy the groundwater contamination. The owned property exclusion does not bar coverage.

### VII. Voluntary Payments

Before the MPCA issued a request for responsive action, SCSC cooperated with the MPCA and incurred obligations for which SCSC seeks to be indemnified. Allied argues that SCSC breached its contractual duty to refrain from voluntarily incurring obligations, citing *Augat, Inc. v. Liberty Mut. Ins. Co.*, 410 Mass. 117, 571 N.E.2d 357, 360 (1991). *Augat*, however, involved extreme facts not present in this case. Tower and Allied also assert[3] that, because these payments were made at SCSC's "own cost," the insurers are not obligated to reimburse SCSC.

■ Appellants incorrectly label as "voluntary payments" the liabilities SCSC incurred by cooperating with the MPCA. When there is a release of a hazardous substance, the MPCA has authority to take any remedial action that it deems necessary to protect the public health or welfare or the environment. Minn.Stat. § 115B.17, subd. 1(a) (1986). Before doing so, the MPCA must ask any party responsible for the contamination to take actions that the MPCA deems reasonable and necessary. *Id.* If the MPCA had prevailed in an action to compel SCSC to take the action requested, the cleanup expenses would constitute damages covered by the policies. *Minnesota Mining & Mfg. Co. v. Travelers Indemn. Co.*, 457 N.W.2d 175, 184 (Minn.1990) (*3M*).

SCSC, faced with the consequences of inaction, took a reasonable course of action by cooperating with the MPCA. In so doing, SCSC may have saved its insurers increased costs of clean-up. *See City of Edgerton v. General Cas. Co.*, 172 Wis.2d 518, 493 N.W.2d 768, 780 (App.1992) (cooperating with Wisconsin Department of Natural Resources mitigated insured's damages by avoiding more expensive clean-up and recoupment of costs by United States Environmental Protection Agency), *pet. for rev. granted*, 497 N.W.2d 130 (Wis.1993). SCSC should not be penalized for having cooperated with the MPCA. We find no error in the trial court's directed verdict on this issue.

### VIII. Prejudice

■ Allied asserts that SCSC breached its contractual duty to notify Allied immediately of the existence of a claim or a suit. Failure to provide notice does not render coverage void unless the insurer can establish actual prejudice. *Reliance Ins. Co. v. St. Paul Ins. Cos.*, 307 Minn. 338, 343, 239 N.W.2d 922, 925 (1976). Whether the insured's notice of suit has prejudiced the insurer is a question of fact. *Hopkins v. Empire Fire & Marine Ins. Co.*, 474 N.W.2d

---

2. As with the jury instruction on SCSC's liability for the acts of third parties, Tower has merely stated its disagreement with the trial court's decision regarding the owned property exclusion. We choose to address this issue despite the absence of argument or authority in Tower's brief.

3. Tower has placed its objection in the same footnote as its objections to the trial court's rulings on the two prior issues. Again, we choose to address the issue because of the significance of this case. This should not be construed as approval of this mode of argument; in almost any other case, we would deem the issues waived.

209, 213 (Minn.App.1991). In this case, the jury found that SCSC's insurers were not prejudiced by any late notice. An appellate court will set aside a jury's answer to a special verdict question only when the answer is perverse and palpably contrary to the evidence. *Fallin v. Maplewood–North St. Paul Dist. No. 622*, 362 N.W.2d 318, 322 (Minn.1985). On appeal, we must view the evidence in the light most favorable to the verdict. *Id.* at 322–23.

■ This case does not involve an insured who simply chose not to inform the insurer of a claim despite its awareness of both a pending claim against the insured and the existence and location of its insurance policies. Under the circumstances of this case, SCSC notified its insurers as soon as practicable.[4] *Minnesota Farm Bureau Serv. Co. v. American Cas. Co.*, 167 F.Supp. 315, 318 (D.Minn.1958), *rev'd on other grounds*, 270 F.2d 686 (8th Cir.1959). The jury's finding is not clearly erroneous.

### IX. *Rapp Testimony*

■ At trial, hydrogeologist Keith Rapp presented his opinion on how the groundwater contamination at the SCSC site occurred. On appeal, Tower challenges the foundation on which Rapp's opinion was based. Tower did not object at the time Rapp testified; instead, Tower raised the foundation argument when moving for a directed verdict at the close of SCSC's case. A timely objection is a prerequisite to appellate review of evidentiary rulings. *Sauter v. Wasemiller*, 389 N.W.2d 200, 202 (Minn.1986). Because Tower failed to preserve this issue, we will not address it on appeal.

Tower also argues that the factual basis for Rapp's testimony was insufficient. Again, because Tower made no timely objection, it has waived this argument. *Id.*

### X. *Vertical Trigger*

Tower argues the trial court erred in holding that both policies were triggered in a vertical fashion, that is, that the 1977 Allied primary policy was triggered first; the 1977

Tower umbrella policy was triggered second; the 1978 Allied primary policy was triggered third; the 1978 Tower umbrella policy was triggered fourth, and so on. Tower argues that all of Allied's primary coverage, from 1977 through 1988, must be exhausted before the first Tower excess policy is triggered.

■ In apportioning the duty to indemnify among insurers, the Minnesota approach is usually to

allocate respective policy coverages in light of the total policy insuring intent, as determined by the primary risks upon which each policy's premiums were based and as determined by the primary function of each policy.

*Integrity Mut. Ins. Co. v. State Auto. & Cas. Underwriters Ins. Co.*, 307 Minn. 173, 175, 239 N.W.2d 445, 446 (1976), *quoted in Interstate Fire & Cas. Co. v. Auto–Owners Ins. Co.*, 433 N.W.2d 82, 85 (Minn.1988). The closeness to the risk analysis works well in a situation involving a simple accident and two carriers at the same level. The present case, however, which involves a primary carrier, an umbrella carrier, and on-going property damage, is different from the cases addressing closeness to the risk. *See Jostens, Inc. v. Mission Ins. Co.*, 387 N.W.2d 161, 165 (Minn. 1986) (single injury-causing event that did not extend over multiple policy periods).

■ We conclude that the trial court correctly adopted a vertical trigger of coverage in this case. Property damage was complete in 1977 when the perc first entered the groundwater. Thus the policies of both insurers were triggered in 1977 when perc entered the groundwater. *See ISCC*, 399 N.W.2d at 159. Had the contamination been immediately discovered, there would be no question that the policies would have been triggered in a vertical fashion. If we required SCSC to exhaust all primary policies between the date of property damage and the date of discovery before triggering the excess policies, we would, in effect, adopt the manifestation rule that *ISCC* rejected. *Id.* Tower agreed to provide excess liability cov-

---

4. We also consider Allied's conduct upon receiving notice to be relevant on the question of prejudice. That conduct is set out in Issue XII.

erage for an occurrence during its policy period. SCSC had such an occurrence in 1977, and Tower is not entitled to exhaustion of all of Allied's underlying policies before the first Tower policy can be reached. *See Dayton Indep. Sch. Dist. v. National Gypsum Co.,* 682 F.Supp. 1403, 1411 n. 23 (E.D.Tex.1988), ("The requirement of exhaustion applies only to those policies which share the same policy period"), *rev'd on other grounds,* 896 F.2d 865 (5th Cir.1990).

## XI. *All Sums*

██ Tower argues that the costs of the cleanup should be allocated among all the years during which property damage occurred and in relation to the proportion of injuries that occurred during a given policy period. *See NSP,* 504 N.W.2d at 247. We disagree.

In *NSP,* the insured entered into a consent order with the MPCA to clean up a contaminated site. NSP sued its insurance carriers, eventually settling with all except one. The district court in *NSP* allocated NSP's damages on a policy limits basis. This court reversed and remanded the case to the district court to "allocate damages based on the percentage of property damage that occurred [in each policy period]." *Id.*

██ In *NSP,* the court allocated damages among insurers; the allocation was not between the insurers and the insured. *Id.* Furthermore, the insured settled with 13 of its 14 carriers "on terms analogous to *Pierringer* settlements." *Id.* at 242. The non-settling carrier was entitled to a determination of the percentage of responsibility attributable to each defendant because of the use of a *Pierringer* settlement. *See* John Simonett, *Release of Joint Tort–Feasors: Use of the Pierringer Release in Minnesota,* 3 Wm. Mitchell L.Rev. 1 (1977).

The insurance policies here obligate Allied and Tower to indemnify SCSC for "all sums" that SCSC is obligated to pay as damages. In the absence of any ambiguity, we must give the language of an insurance policy its common, ordinary and accepted meaning. *Bobich v. Oja,* 258 Minn. 287, 294, 104 N.W.2d 19, 24 (1960). The phrase "all sums"

means that SCSC is entitled to be paid for its entire loss. *Dayton Indep. Sch. Dist.,* 682 F.Supp. at 1410. The policies do not require SCSC to share pro rata in the indemnification obligation which the insurers have undertaken. *Id.* at 1411; *see also Keene Corp. v. Insurance Co. of N. Am.,* 667 F.2d 1034, 1048 (D.C.Cir.1981) ("There is *nothing* in the policies that provides for a reduction of the insurer's liability if an injury occurs only in part during a policy period") (emphasis in original), *cert. denied,* 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982). The trial court correctly denied allocation.

## XII. *Duty to Defend and Sole Liability*

Allied challenges the trial court's holding that Allied has a duty to reimburse SCSC fully for all costs of defending against the MPCA's action.

██ An insurer's duty to defend its insured arises whenever any part of the claim against the insured is arguably within the scope of coverage afforded by the policy. *Brown v. State Auto. & Cas. Underwriters,* 293 N.W.2d 822, 825–26 (Minn.1980). Typically, the question of whether an insurer must provide a defense is determined by comparing the allegations of the complaint against the insured with the indemnity provisions of the policy. *See Garvis v. Employers Mut. Cas. Co.,* 497 N.W.2d 254, 256 (Minn. 1993).

██ Allied received a demand letter dated October 6, 1989, from the MPCA seeking payment of cleanup costs. This letter constituted a claim that would trigger a duty to investigate and defend under the policy. *See A.Y. McDonald Indus. v. Insurance Co. of N. Am.,* 475 N.W.2d 607, 626–29 (Iowa 1991). After receiving the demand letter, SCSC notified its insurers of MPCA's action. The notice letter specified the policy numbers and years of coverage. The letter then went on to state,

We ask that you investigate this claim for coverage and advise us as to Allied's coverage position promptly. Please do not hesitate to contact me if you would like to discuss this matter further.

Over one year later, when Allied had not stated a coverage position, SCSC commenced

suit. During the intervening months, adjusters and inspectors for Allied led SCSC to believe that Allied was actively investigating the claim. In fact, this was not the case.

 The duty to defend is determined as of the time SCSC tendered the defense to its insurers. *Jostens,* 387 N.W.2d at 166. Allied argues that, at the time of tender, the facts SCSC gave to Allied did not show arguable coverage under the Allied policies. Allied, having failed to communicate with its insured and having failed to give its insured an opportunity to correct any shortcomings in its demonstration of arguable coverage, will not be allowed now to assert that the tender of defense was insufficient. Allied was under a statutory obligation either to state its coverage position within 30 business days after receiving notice of the claim or to advise SCSC that it could not reasonably complete its investigation of the claim within 30 days. Minn.Stat. § 72A.201, subd. 4(3) (1988). If Allied denied the claim, Allied was obligated to specify the policy provision or condition on which the denial was based. *Id.,* subd. 8(1). In addition, Allied could not deny the claim without providing the name, address and telephone number of Allied's claims service office or the claim representative to whom SCSC could take questions or complaints about the denial. *Id.,* subd. 8(5)(ii). Allied did none of these. If Allied had complied with its statutory duties, SCSC might have been able to establish that there was arguable coverage and that Allied was obligated to defend. Allied should not be rewarded for failing to communicate with its insured.

 Next, Allied argues the trial court erred in holding that SCSC is entitled to reimbursement for all costs incurred from the time of the request for information. Allied argues that the costs incurred to determine the extent of the groundwater contamination at the SCSC site were not part of the defense obligation that Allied undertook. Although the costs of purely preventative measures are not covered unless there is property damage, the costs of cleaning up pollution

that is present are covered under the policies. *NSP,* 504 N.W.2d at 245. In addition, "other expenses causally related to remedying the groundwater pollution are covered." *Id.* at 246. We conclude that the investigation costs are covered. Determining the existence and extent of perc contamination of the groundwater was the first step in the cleanup.

Allied argues that if this court holds it responsible for the investigation costs, "any costs borne by any insured in satisfying its statutory obligations pursuant to any regulations would similarly be 'damages' resulting from a 'suit.'" We disagree. The supreme court rejected a similar argument in *3M,* 457 N.W.2d at 184. The investigation costs here are only covered because they were causally related to remedying the property damage at the SCSC site.

 An insured is entitled to recover attorney fees incurred in bringing a declaratory judgment action to compel its insurer to provide a defense. *Garrick v. Northland Ins. Co.,* 469 N.W.2d 709, 713 (Minn.1991); *Morrison v. Swenson,* 274 Minn. 127, 137–38, 142 N.W.2d 640, 647 (1966). Because Allied had a duty to defend, it is obligated to reimburse SCSC for the costs of compelling Allied to accept that duty.

 Allied next contends the trial court incorrectly assigned all of the obligation for defense costs to Allied because Allied was the primary carrier and its policy limits had not been exhausted, citing *Jostens,* 387 N.W.2d at 167.[5] *Jostens* involved a primary carrier, an excess carrier, and the question of their respective duties to defend the insured. Because the umbrella policy in *Jostens* provided broader coverage than the primary policy, the court held the umbrella carrier responsible for the cost of defending only the claims that fell within the umbrella policy's broader coverage. *Id.* at 167–68. The present case also involves a primary and an excess carrier. The excess carrier's coverage, however, is not broader than the primary carrier's coverage. Allied cannot show that

---

5. Tower argues Allied has improperly raised this argument for the first time on appeal. We believe Allied properly raised the issue at the first available opportunity. We will address this issue.

any of the defense costs were for claims that were covered only under broader coverage afforded by Tower. Therefore, the trial court correctly held that Allied is solely responsible for the costs of defense.

### XIII. *Enhanced Attorney Fees*

■ Finally, Allied and Tower challenge the trial court's award of enhanced attorney fees to SCSC. Attorney fees incurred in compelling an insurer to recognize its duty to defend its insured are recoverable as damages incident to a breach of contract. *Morrison*, 274 Minn. at 138, 142 N.W.2d at 647; *Seaway Port Auth. v. Midland Ins. Co.*, 430 N.W.2d 242, 252 (Minn.App.1988). In the present case, the trial court held evidentiary hearings to determine the reasonableness of the hourly rate charged by SCSC's attorneys and closely examined the hours spent on the case. Allied and Tower do not challenge the trial court's findings on this aspect of the attorney fees awarded.[6] They contend the trial court erred when it applied a multiplier of 1.5 to the fees actually incurred. We agree.

■ In concluding that a multiplier was appropriate, the trial court applied the analysis used to determine reasonable attorney fees in civil rights cases. The rationale for awarding attorney fees in civil rights cases is

> to encourage victims of discrimination to bring suit, particularly where the relief sought is not a large money judgment, and to make legal counsel available in these cases.

*Sigurdson v. Isanti County*, 386 N.W.2d 715, 722 (Minn.1986). That rationale is not present in breach of contract cases. The public policy of fighting discrimination is advanced by the private attorneys who bring civil rights suits. No similar public policy in favor of declaratory judgments on insurance coverage exists.

The first step in calculating civil rights attorney fee awards is to determine the "lodestar" figure, which is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.

*Anderson v. Hunter, Keith, Marshall & Co.*, 417 N.W.2d 619, 628 (Minn.1988). The court may increase or decrease the lodestar figure as necessary to attain an award of attorney fees that is fair. *See DeGidio v. Pung*, 920 F.2d 525, 533–34 (8th Cir.1990).

In cases in which there is statutory authority for an award of attorney fees, there is a strong presumption that the lodestar figure is the reasonable fee. *City of Burlington v. Dague*, — U.S. —, —, 112 S.Ct. 2638, 2641, 120 L.Ed.2d 449 (1992). In declaratory judgment actions, the lodestar figure should be adequate to place the insured in the same position it would have been in but for the insurer's breach of its contractual duty to defend. Although specific statutory authorization exists for enhanced attorney fees in civil rights cases, Minnesota's declaratory judgments act does not provide authority for an award of attorney fees in most declaratory judgment actions. *Garrick*, 469 N.W.2d at 714. The act certainly does not authorize enhanced attorney fees.

The trial court was concerned that the lodestar figure submitted by SCSC's counsel would not adequately compensate counsel for the services performed. Since counsel for SCSC had requested a specific amount of attorney fees, the court should have presumed that the requested amount was adequate compensation.

Allied argues the trial court's award of attorney fees includes the expenses of a contribution claim brought by Control Data. The trial court found this action was causally connected to the covered claims, and SCSC was entitled to a defense. We agree. Allied has not established that the hours claimed were not necessary for this case.

The record amply supports the trial court's findings that the attorney fees sought were reasonable and necessary. The enhancement of that award was erroneous, however, and must be reversed.

### XIV. *Notice of Review*

SCSC has filed a notice of review regarding its reasonable expectations of coverage, what a policyholder must show to establish a

---

6. The trial court found reasonable attorney fees for the MPCA action were $55,821.50; for the

declaratory judgment action, $426,647.00 (as of July 1, 1993).

prima facie case, and the interpretation of the sudden and accidental exception to the pollution exclusion and the phrase "expected or intended from the standpoint of the insured." Given our disposition of this case, we do not address those issues.

▮▮▮▮ SCSC has also moved to strike exhibits and matters outside the record from the brief of amicus Insurance Environmental Litigation Association (IELA). This court cannot base its decision on matters outside the record. *Brandenberg v. Auto–Owners Ins. Co.,* 352 N.W.2d 97, 100 (Minn.App. 1984); Minn. R. Civ.App. P. 110.01. IELA argues that this rule should not apply to an amicus, but cites no authority for this proposition. The material is stricken.

### DECISION

The property damage that perc caused in 1977, during the policy period, triggered the insurance coverage in this case. SCSC is entitled to coverage because the insurers failed to prove that the causes of property damage excluded under the policy had been the overriding causes of damage here. The trial court did not abuse its discretion when it formulated the special verdict form or the jury instructions. SCSC carried its burden of proving that a sudden and accidental perc spill caused property damage. Neither the owned property exclusion nor the voluntary payments exclusion bars coverage in this case. The jury's factual determination that the insurers were not prejudiced by the timing of notice claim is not clearly erroneous. The primary and umbrella insurance policies were triggered vertically for each year of coverage. The trial court properly required Allied to reimburse SCSC for all its costs to defend its case. The trial court erroneously enhanced the award of attorney fees to SCSC.

The trial court did an admirable job of defining and addressing the issues presented by this case. With the exception of the attorney fees enhancement, the trial court is affirmed.

**Affirmed in part and reversed in part.**