**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

No.  96-10658

---

SNYDERGENERAL CORP.

Plaintiff-Appellant,

VERSUS

CONTINENTAL INS. CO. A New Hampshire Corp, ET AL,
Defendants,

GREAT AMERICAN INSURANCE COMPANIES, an Ohio Corp.; UNITED STATES
FIRE INSURANCE COMPANY, a New York Corp.,

Defendants-Appellees.
------------------------------

SNYDERGENERAL CORP.

Plaintiff

VERSUS
NORTHBROOK PROPERTY & CASUALTY INSURANCE CO.,

Defendant

---

Appeal from the United States District Court
for the Northern District of Texas
February 2, 1998

Before  JOLLY, DUHÉ, and PARKER, Circuit Judges.

DUHÉ, Circuit Judge:

Appellant SnyderGeneral sued its insurers, Great American and
U.S. Fire, for costs incurred in cleaning up groundwater
contaminated with TCE.  Appellees denied coverage on the basis of
the pollution exclusion clauses in the policies and successfully
moved for summary judgment.  The district court found that not only

did the exclusion preclude coverage but also that Appellant was an habitual polluter. We agree that the pollution exclusion clause precludes coverage.

## I

In 1984, SnyderGeneral merged with McQuay, a Minneapolis company that also manufactured heating and air conditioning equipment. McQuay changed its name to SnyderGeneral.

McQuay owned a plant in California which it operated from 1961-1974.[1] The plant used TCE as a vapor degreasing solvent to remove oil from air conditioning coils as they moved on a conveyer belt, through a degreaser. A still attached to the degreaser recycled the TCE by vaporizing it to separate it from the oil. The TCE was then condensed as clean TCE and piped back into the degreaser. Former employees testified that they also used TCE to clean oil off their hands, to wipe oil from the equipment, and to clean oil from the floor. The plant utilized a drain system to collect any liquid that spilled onto the floor. The drains emptied into four or five dry wells at the west end of the property.

In the late 1960's there was a large, accidental spill of TCE at the plant. An employee who witnessed the spill stated that an automatic float in a still connected to the degreaser stuck and caused TCE to overflow into a floor drain.[2]

_____

[1]In 1976, SSP Industries leased the plant from McQuay. SSP later purchased the plant in 1979.

[2]Appellees dispute whether the spill actually occurred; however, for purposes of this opinion, we assume arguendo that it

Three years after merging with McQuay, SnyderGeneral received notice from Stanley-Bostitch, Inc. which operated a plant next door to and down gradient from the McQuay plant, that the California Regional Water Quality Control Board had ordered Stanley-Bostitch to clean up the contaminated groundwater. The notice also alleged that the primary source of contamination was under and in the vicinity of the former plant site.

Two months later, the California Department of Health Services sent SnyderGeneral a letter requesting that SnyderGeneral provide information concerning McQuay's activities at the plant. SnyderGeneral received a similar letter from the California Regional Water Quality Control Board.

As a result, SnyderGeneral notified both its insurers, Great American and U.S. Fire, of the claims related to the former plant and to advise them of an opportunity to settle with Stanley-Bostitch. SnyderGeneral stated that the pollution resulted from the large TCE spill. Both policies contain a pollution exclusion clause which excluded property damage or liability

> arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

U.S. Fire never responded to SnyderGeneral's letter nor did it conduct an investigation of SnyderGeneral's claims. Great American did.

3

requested additional information about the claim which SnyderGeneral provided; however, Great American sent no further responses and never investigated. SnyderGeneral sued asserting breach of contract and the duty of good faith and fair dealing and violation of the Texas Insurance Code.[3] Great American and U.S. Fire successfully moved to dismiss on summary judgment all of SnyderGeneral's claims.[4] SnyderGeneral appeals.

II

**A. STANDARD OF REVIEW**

We review grants of summary judgment de novo. Rizzo v. Children's World Learning Ctr., Inc., 84 F.3d 758, 761 (5th Cir. 1996); Brock v. Charter, 84 F.3d 726, 727 (5th Cir. 1996). Under Rule 56(c), a court will grant summary judgment when the pleadings and evidence show that there is no genuine issue as to any material fact.

**B. ANALYSIS**

Because this is a diversity case, the district court had to determine which state law applies to each insurer. The parties agreed that Texas law applies to U.S. Fire, and the district court found that Minnesota law applies to Great American. SnyderGeneral does not dispute this finding; therefore, we apply the laws of Texas and Minnesota to U.S. Fire and Great American, respectively.

---

[3]Because we hold that the pollution exclusion clause precludes coverage of the large TCE spill, we do not address the other claims.

[4]SnyderGeneral originally sued eleven of its insurers, but it settled with all except Great American and U.S. Fire.

As the district court noted, the threshold issue is whether the large TCE spill comes within the "sudden and accidental" exception to the pollution exclusion clause.

**1. Great American**

Great American argues that whether the large spill occurred or not is unimportant under Minnesota law. Rather, to determine whether a discharge was sudden and accidental, the issue is how the contaminants entered the groundwater. We agree.[5]

In Board of Regents of the Univ. of Minn. v. Royal Ins. Co. of America, 517 N.W.2d 888 (Minn. 1994), the appellant had installed in a building fireproofing material that had released asbestos fibers. The appellant had sued its insurance companies demanding the cost of removing the asbestos from the building. Id. The appellant argued that the release of asbestos fibers over a period of twenty years was "sudden" because the release was unexpected. Id. at 891. In determining how to interpret "sudden", the Minnesota Supreme Court noted that "sudden" and "accidental" were used together; therefore, if "sudden" meant "unexpected" then the term "accidental" would be redundant. The word must have a temporal element; therefore, a "sudden" release could not be

---

[5]This is not to suggest that the relevant discharge or "release point" always coincides with the "occurrence" of actual damage or injury. See, e.g., Hartford Accident & Indem. Co. v. U.S. Fidelity & Guar. Co., 962 F.2d 1484, 1491 (10th Cir. 1992) ("We have found almost universal agreement among federal courts applying the pollution exclusion that it is the discharge which must be sudden and accidental to qualify for coverage, not the pollution damage."). As we discuss further below, however, under the unique facts of this case, the two events do coincide.

gradual. <u>Id.</u> at 892. The Court also noted that "sudden and accidental" modified "discharge". As a result "sudden and accidental" referred to the escape of the polluting waste. <u>Id.</u>

SnyderGeneral contends that the degreaser tank contained the TCE so the relevant escape is the spill. SnyderGeneral relies heavily on <u>SCSC v. Allied Mutual Ins. Co.</u>, 515 N.W.2d 588 (Minn. Ct. App. 1994), <u>aff'd</u> in part, <u>rev'd</u> in part, 533 N.W.2d 603 (Minn. 1995), to bolster its argument. There, a wholesale distributor of perc, a dry cleaning chemical, was ordered to clean up perc contaminated ground water. The distributor then wrote to its two insurance companies seeking coverage. The distributor claimed that it fell outside of the pollution exclusion clause because the pollution was the result of one large spill. A driver of one of the perc delivery trucks was filling the tank when it overfilled and sprayed into his eyes. While the driver was helped to an emergency shower, perc continued to flow out for two or three minutes. The perc ran out of the facility and into the parking lot. Soon thereafter, there was a heavy rain shower which washed the perc into the ground water. As here, the distributor brought suit to force the insurance companies to pay the clean up costs. The case went to trial and the jury found that the spill was sudden and accidental. <u>Id.</u> at 592-94.

The insurers, relying on several landfill cases, argued that the release could not have been sudden as a matter of law because the relevant release occurred when the pollutants leaked out of the soil and into the groundwater. The appeals court disagreed stating

6

a court determines suddenness by the pollutant's release from a state of containment not by the time that elapses before the pollution was discovered. The court distinguished the landfill cases stating that landfills were meant to hold pollutants in suspension above the groundwater; the distributor, however, made no attempt to store perc in the soil above groundwater.

SnyderGeneral argues that here it, too, made no effort to store TCE in soil above the groundwater. Like SCSC, the relevant escape is from the storage tank. Moreover, the speed of migration of the TCE is irrelevant because the contaminant is not emerging from a state of confinement since dry wells were not meant to contain. We find SnyderGeneral's reliance upon SCSC unpersuasive for two reasons.

First, Board of Regents is the most recent statement of the law. Moreover, because it is a Minnesota Supreme Court case, it controls our reasoning. Therefore, to the extent that Board of Regents contradicts SCSC, we must reject SCSC. The Minnesota Supreme Court states that "discharge" means the escape of waste from a particular place. Board of Regents, 517 N.W.2d at 892. We understand this to mean that courts are to focus on the point at which the polluting waste escapes from its intended place of containment. Here, the record shows that SnyderGeneral intended to contain TCE in the dry wells because the dry wells were designed to allow the TCE to make its way from the plant floor to the dry wells--the ultimate place of containment; therefore, we hold that the relevant release is from the dry wells.

7

Second, SCSC is, in any event, distinguishable.  In SCSC, it was the rainstorm that allowed the perc to get into the groundwater, and the rainstorm was something the distributor had no control over.  Here, SnyderGeneral had control over how the TCE escaped.  As the diagram of the plant shows, the purpose of the floor drain system was to catch any spills and drain them into the dry wells which then allowed the TCE into the seepage pit.  The record also reveals that immediately after the large spill of TCE from the degreaser tank, SnyderGeneral knew about the spill and could have taken steps to clean it up from the floor or by pumping or digging it from the dry wells.  Its failure to do so demonstrates that, even if the tank was the initial place of containment for large-volume TCE, the dry wells became the ultimate intended place of containment.  Thus, there is no genuine issue of material fact concerning whether SnyderGeneral intended to contain the pollutants in the dry wells.

The remaining question is whether the release was "sudden and accidental".  Under the policy terms, the discharge of TCE from the dry wells must have been both sudden and accidental to qualify for coverage.  SnyderGeneral cannot claim that the discharge was accidental.  Under Minnesota law, "accidental" means "unexpected".  Board of Regents, 517 N.W. 2d at 892.  While the overflow of TCE from the tank might well have been unexpected, the overflow is irrelevant.  As explained above, the relevant discharge is from the dry wells so we examine whether that discharge was accidental.  The record shows that the purpose of the dry wells was to leach waste

8

liquid into the surrounding environment. SnyderGeneral cannot characterize this discharge as unexpected. The drain system acted exactly as it was designed to do. Because the discharge was not accidental, we need not determine whether it was sudden. Therefore, we hold that the district court did not err in granting summary judgment in favor of Great American.

## 2. U.S. Fire

To determine what the relevant release is under Texas law, we look to <u>Union Pacific Resources Co. v. Aetna Casualty & Surety Co.</u>, 894 S.W.2d 401 (Tex. App.--Fort Worth 1994, writ denied). There, the Texas Court of Appeals held in a landfill case that the subsequent escape of pollutants from the disposal site was the critical inquiry for determining whether the pollution exclusion clause precluded coverage. <u>Id.</u> at 404.[6] The record shows that purpose of the dry wells was to drain out the liquid from the floor drains. Therefore, we hold that under Texas law, the relevant discharge is from the dry wells. Moreover, since the dry wells were designed to leach out liquid, SnyderGeneral expected the waste to discharge into surrounding environment. Thus, the discharge was not accidental. Again, we hold that the district court did not err in granting summary judgment in favor of U.S. Fire.

---

[6]<u>Union Pacific</u>, like the instant case, involved circumstances in which the relevant discharge under the pollution exclusion clause coincided with the occurrence triggering coverage under the policy. <u>See</u> <u>id.</u> at 404 ("We hold where material has been deposited in a place which was believed to serve as a landfill for such waste, the polluting 'occurrence' is the 'discharge, dispersal, release, or escape' . . . of toxic material into the environment.").

**CONCLUSION**

For the above reasons, we AFFIRM the district court's grant of summary judgment.