## MILWAUKEE MUTUAL INSURANCE COMPANY v. CITY OF MINNEAPOLIS AND OTHERS.

239 N. W. 2d 472.

February 27, 1976—No. 45459.

*Rider, Bennett, Egan, Johnson & Arundel, Chester D. Johnson,* and *Lee T. Peterson,* for appellant.

*Stephen M. Goldfarb* and *George W. Roberts,* for respondents James.

*Feinberg, Meyers, Schumacher & Schumacher* and *George G. Seltz,* for respondent Nyenhuis.

*Robert J. Alfton,* for respondent city.

Heard before Kelly, Todd, and MacLaughlin, JJ., and considered and decided by the court en banc.

TODD, JUSTICE.

Milwaukee Mutual Insurance Company (Milwaukee Mutual) appeals from an order denying its alternative motion for amended findings or a new trial and from the judgment entered. Milwaukee Mutual sought a declaratory judgment that a homeowner's policy issued by it to Jerome Nyenhuis (Nyenhuis) did not cover injuries sustained by William V. James III (James). Nyenhuis and James were fellow police officers employed by the city of Minneapolis, and James was accidentally shot by Nyenhuis at the police station just prior to going on duty. The lower court found that the conduct which caused the injury was "ordinarily incident to nonbusiness pursuits," so the exclusionary provision in the policy under which Milwaukee Mutual sought to deny coverage was not applicable. We affirm.

The matter was submitted for determination by the lower court on stipulated facts, the most significant of which are:

"2. As to the personal liability coverage for bodily injury and medical payments coverage [the homeowner's insurance policy issued by Milwaukee Mutual to Nyenhuis] contained the following provisions, among others:

"EXCLUSIONS

"This policy does not apply:

"1. Under Coverage E—Personal Liability and Coverage F—Medical Payments to Others:

\* \* \* \* \*

"d. to bodily injury or property damage arising out of business pursuits of any Insured except activities therein which are ordinarily incident to non-business pursuits;

\* \* \* \* \*

"8. DEFINITIONS: \* \* \* When used in this policy the following definitions apply:

\* \* \* \* \*

"d. 'business' means

"(1) a trade, profession or occupation \* \* \*."

"3. At all times herein material, within the meaning of the above definition, the 'trade, profession, or occupation' of Jerome Nyenhuis was that of being a Police Officer employed by the City of Minneapolis assigned to the Special Operations Division.

"4. That at all times herein material, the usual duty shift of the Special Operations Division including Jerome Nyenhuis, was from 7:30 p. m. to 3:30 a. m. The officers assigned to this Division were not required, to be present in the roll call room until 7:30 p. m., and no sanctions would be taken against any officer if he did not arrive in the roll call room until precisely 7:30 p. m. \* \* \* They were expected to be in roll call room when roll call commenced. \* \* \*

\* \* \* \* \*

"6. It was a frequent practice of Officer Jerome Nyenhuis and other members of the Special Operations Division, on their duty nights, to arrive at City Hall shortly after 7:00 p. m. On

April 14, 1972, Officer Jerome Nyenhuis arrived at police headquarters shortly after 7:00 p. m. * * *

"7. One reason why Officer Jerome Nyenhuis and other members of the Special Operations Division reported early to police headquarters was to check their mailboxes, check the bulletin board, find out what had transpired in the last 24 hour period of time, to secure photographs or bulletins of wanted persons, to consult the assignment sheet for that night, to obtain one of the daily activity bulletins which reported the crimes for the last 24 hour period, to secure a squad car, and to secure other needed pieces of equipment. * * * The officers regarded these activities as related to their police duties, but they reported early to conduct these activities merely as a matter of convenience to themselves, or because they wanted first choice of the available equipment. * * *

"8. The Special Operations Division was a very close knit group of police officers, and it was a frequent practice to meet both before and after their normal tours of duty to discuss the events of the day and to generally engage in social discourse. * * * Captain Whelan indicated that many of the officers would come into his office prior to roll call, and that they were quite likely to talk about activities both related to and unrelated to police work. * * * Before the tour of duty, much of this socializing apparently went on in the roll call room. * * *

"9. Those officers awaiting roll call in the roll call room, were technically on duty 24 hours per day. * * * However, a more correct statement would be that officers of the Special Operations Division * * * were subject to being called on short notice to handle an emergency or special situation. However, an officer was only expected to work 40 hours per week; if he worked more than 40 hours because of a special call to duty, he was given compensatory time off from his regularly scheduled tour of duty.

"10. A Minneapolis police officer is required to obtain a service revolver and to wear it or carry it with him when on duty.

* * * An officer should carry his revolver with him at all times except when going to a party if he will be drinking alcoholic beverages. * * *

"11.    Officers of the Special Operations Division are expected to head for their squad cars following roll call. However, if they have not done so previously, they can take time at that time to check the mailbox, bulletin boards, review reports of stolen cars, check the daily activity report, and check out a squad car or other needed equipment. No sanctions will be taken against an officer if he has not completed this sort of activity prior to roll call. * * *

"12.    When he arrived at the Special Operations Division headquarters shortly after 7:00 p. m., on April 14, 1972, Officer Jerome Nyenhuis went into the office of Captain Thomas Whelan who was in charge of the Special Operations Division, had a conversation with him or with Sgt. Torrey to check on what assignment he was going to have for that evening, obtained one of the daily activity bulletins, consulted his assignment sheet, and checked his mailbox. * * *

"13.    Thereafter at approximately 7:15 p. m., Officer Jerome Nyenhuis went to the roll call room at which time three or four other officers were already present in the roll call room.

* * * * *

"15.    After arriving in the roll call room, Officer Nyenhuis became engaged in a conversation with Officers David W. Mack and James D. Murphy discussing a new Smith & Wesson service revolver which Officer Mack had just purchased. The discussion regarding said revolver had to do primarily with the trigger pull of Officer Mack's new revolver and how the trigger pull could be eased by reducing the tension on the main spring.

"16.    Officer Nyenhuis stated that he did not think it was a good idea to do so because releasing tension on the main spring would result in less force being applied to the hammer thereby creating the possibility of a misfire; that the conversation then switched from Officer Mack's weapon to Officer Nyenhuis'

police service revolver and of other ways of easing the trigger pull on such a revolver.

"17. That during the course of this conversation, Officer Nyenhuis removed his pistol from its holster for illustrative purposes. He performed the steps which he thought would unload the pistol, ejecting the cartridges into his right hand and then putting them into his pocket, and closing the cylinder. Unfortunately, one shell remained in the cylinder and as the pistol was presented for examination to those present, the pistol discharged, striking Officer William V. James in the groin area."

The lower court held that there was coverage under the homeowner's policy. In its memorandum accompanying its order, the court found that the accident arose out of the business pursuits of Nyenhuis, but that the activities giving rise to the injury were ordinarily incident to nonbusiness pursuits and not excluded by the insurance policy.

In its memorandum accompanying its order denying Milwaukee Mutual's blended motion for amended findings or a new trial, the lower court further expanded its reasons for finding coverage. The lower court said:

"That conclusion [that coverage applied] was a result of the Court's opinion that the exclusion whereby the policy did not apply:

" 'd.   to bodily injury or property damage arising out of business pursuits of any Insured except activities therein which are ordinarily incident to non-business pursuits;'
was ambiguous and not understandable unless broken down into two separate determinations, i.e., firstly whether the insured was engaged in a business pursuit, and secondly, the activities giving rise to the injury were 'ordinarily incident to non-business pursuits.' By so reading the exclusion, the Court arrived at the determination that there was coverage under the policy."

Milwaukee Mutual, while raising as the main issue the question of whether the lower court erred in determining that the

conduct giving rise to the injury was incident to nonbusiness activities, also contends that the language of the policy is not ambiguous and that the court erred in so holding.

However, a careful reading of the lower court's second memorandum does not indicate that it regarded the language as ambiguous. Our conclusion that the lower court did not find the language ambiguous is arrived at by analyzing both of the lower court's memoranda. By separating the issues, the court resolved any question of ambiguity. It found that Nyenhuis was engaged in a business pursuit, but that the conduct giving rise to the injury was ordinarily incident to nonbusiness pursuits.

The trial judge's finding that the exclusion does not apply to the facts involved is eminently reasonable. The lower court's factual determination as to the nature of the activities giving rise to the injuries was not clearly erroneous and therefore will not be set aside by this court on appeal. Rule 52.01, Rules of Civil Procedure.

As the Michigan Supreme Court recognized in a case holding the precise type of exclusion here at issue to be inapplicable to the facts there involved, an insurer who denies coverage on the basis of a policy exclusion bears the burden of proof:

"* * * [T]he principle generally applied by the courts is that if proof is made of a loss apparently within a contract of insurance, the burden is upon the insurer to prove that the loss arose from a cause of loss which is excepted or for which it is not liable, or from a clause which limits its liability." Morrill v. Gallagher, 370 Mich. 578, 587, 122 N. W. 2d 687, 691 (1963), quoting 29A Am. Jur., Insurance, § 1854.

The trial judge properly determined that Milwaukee Mutual did not satisfy its burden of proof here. As he observed in the memorandum accompanying his first order, "hunting, weapon collecting and target shooting are but examples of non-business pursuits to which activities such as pistol handling and trigger spring checking [the activities giving rise to James' injury] are ordinarily incident." Therefore, the present case is clearly dis-

tinguishable from others holding exclusions similar to the present one to deny coverage where the injury-producing objects were things that would rarely, if ever, be used for other than business purposes. Contrast, e. g., Pitre v. Pennsylvania Millers Mutual Ins. Co. 236 So. 2d 920 (La. App. 1970) (auger); Berry v. Aetna Cas. & Surety Co. 221 So. 2d 272 (La. App. 1969) (forklift truck).

Although the parties cite and discuss many cases from other jurisdictions regarding "business pursuits" exclusions similar to the instant one, we concur with an Illinois court which, in confronting this issue, stressed: "* * * [I]t is our task to construe the policy clause in question with reference to the facts in this particular case." State Farm Fire & Cas. Co. v. Nat. Union Fire Ins. Co. 87 Ill. App. 2d 15, 19, 230 N. E. 2d 513, 515 (1967).

Therefore, we can derive only general guidance from cases involving different fact situations. However, to the extent that general principles can be gleaned from the case law on this issue, we note that such principles are fully consistent with the trial judge's disposition herein. An article in 1970 Ins. L. J. 519, entitled *The "Business Pursuits" Exclusion in Personal Liability Insurance Policies: What The Courts Have Done With It,* summarizing cases dealing with this problem, concluded (1970 Ins. L. J. 533):

"* * * In most of the cases in which the exclusion has been at issue the courts have found coverage. * * * A court will look at the language from the standpoint of what a reasonable purchaser of the insurance policy would have understood the language to mean, even if this defeats the intent of the insurer in placing the language in the policy. * * *

\* \* \* \* \*

"The courts for the most part have not used their opinions to enunciate any general rules for application in cases involving the 'business pursuits' exclusion. * * *

"There seems almost unanimous accord in the decisions that the location at which an act is performed is not decisive on the

question of whether the act constitutes part of an excluded business pursuit. Rather, it is the nature of the particular act involved and its relationship, or lack of relationship, to the business that controls. Personal acts, such as pranks, do not become part of a business pursuit, so as to be outside of the coverage, merely because performed during business hours and on business property. In order for an act to be considered part of a business pursuit it must be an act that contributes to, or furthers the interest of, the business and one that is peculiar to it. *It must be an act that the insured would not normally perform but for the business, and must be solely referrable to the conduct of the business.*" (Italics supplied.)

Affirmed.

MR. JUSTICE AMDAHL took no part in the consideration or decision of this case.