SCSC CORP., Formerly Known as Schloff Chemical and Supply Company, Petitioner, Respondent,

v.

ALLIED MUTUAL INSURANCE COMPANY, as Successor in Interest to AID Insurance Company and Tower Insurance Company, Petitioners, Appellants.

Nos. C2–93–1408, C8–93–1414 and C3–93–1630.

Supreme Court of Minnesota.

June 16, 1995.

Sean E. Hade, Mary P. Rowe, Jardine, Logan & O'Brien, St. Paul, for Tower Ins. Co.

Dale O. Thornsjo, Eric J. Strobel, Peters & Hektner, Ltd., Minneapolis, for Allied Mut. Ins. Co. for appellant.

Thomas C. Mielenhausen, James A. Mennell, Popham, Haik, Schnobrich & Kaufman, Ltd., Minneapolis, for respondent.

Charles E. Lundberg, Bassford, Lockhart, et al., Minneapolis, for amicus curiae Ins. Environmental Litigation Assoc.

Hubert H. Humphrey, III, Atty. Gen., Stephen Shakman, Adonis A. Neblett, Asst. Attys. Gen., St. Paul, for amicus curiae State of Minn.

## OPINION

KEITH, Chief Justice.

In October 1990, SCSC Corp., formerly known as Schloff Chemical and Supply Company, commenced this action against its liability insurance carriers, Allied Mutual Insurance Company and Tower Insurance Company. SCSC sought a determination of the insurers' obligations under liability insurance policies for costs SCSC incurred as the result of soil and groundwater contamination. Following trial, the jury returned a verdict in favor of SCSC. In its Amended Findings of Fact, Conclusions of Law and Order for Judgment [hereinafter "amended order"], the trial court ordered a total judgment of $996,-017.90 against Allied. This included $100,000 in remediation costs, enhanced reasonable attorney fees based on a 1.5 multiplier, and additional costs, disbursements and interest. The trial court also ordered judgment against Tower for remediation costs of $386,-294.41. The Minnesota Court of Appeals affirmed in all respects except the enhanced portion of the attorney fees award. We affirm in part, reverse in part and remand.

I.

From 1976 to the end of 1988, SCSC operated a dry cleaning and laundry supply distribution facility in St. Louis Park, Minnesota. As a small portion of its business, SCSC purchased, stored, repackaged and distributed perchloroethylene (PCE or "perc"), a chemical used by retailers to dry-clean clothes. The Minnesota Pollution Control Agency ("MPCA") has identified perc as a volatile organic compound. SCSC stored perc in two above-ground storage tanks. Outgoing perc was dispensed through a fill pipe at the southwest corner of SCSC's building into independent contract delivery trucks, which delivered the perc to SCSC customers. To fill a delivery truck with perc, the truck driver connected a hose from the truck's tank to the fill pipe. The driver was responsible for placing a five gallon bucket under the fill pipe to capture any perc that dripped when the fill pipe and the hose were uncoupled.

During much of the time SCSC was in business, it purchased from Allied and Tower the following comprehensive general liability policies and excess liability policies, each of which were in effect for a period of one year:

| Insurer | Cumulative Period of Coverage | Type of Coverage | Property Damage Liability Limits |
|---------|-------------------------------|------------------|----------------------------------|
| Allied | 10/10/75–10/10/84 | Comprehensive General Liability (CGL) Coverage | $100,000 per occurrence/ $100,000 in the aggregate |
| Tower | 4/2/77–10/10/82 | Excess Liability (Umbrella) Coverage | $1,000,000 per occurrence/ $1,000,000 in the aggregate $10,000 retained limit |
| Allied | 10/10/82–10/10/84 | Excess Liability (Umbrella) Coverage | $1,000,000 per occurrence/ $1,000,000 in the aggregate $10,000 retained limit |

In October 1988, the MPCA contacted SCSC in regard to a detection of perc in the groundwater downgradient of the SCSC facility. Because SCSC was the only perc handler in the immediate area, the MPCA issued a Request for Information ("RFI"), instructing SCSC to provide information regarding chemical storage and potential chemical leaks at the facility. In his November 16, 1988 response to the MPCA's RFI, SCSC's general manager, Dennis Zimmer, indicated that SCSC stored perc waste at the facility and that "[d]rippings have occurred at the southwest corner of the building during filling of tanks. Attaching couplings and hoses during the fill process have caused drips * * *." Further, SCSC indicated that the "[v]olume [is] unknown—since drips have occurred for a period of years in small volume." In December 1988, in response to the MPCA's action, SCSC retained the services of Delta Environmental Consultants, Inc.

From December 1988 to January 1990, the MPCA required SCSC to develop several remedial work plans to investigate and to respond to the perc contamination detected in the aquifer under the SCSC facility. SCSC was required to pay for these measures, which included the installation of at least twenty monitoring wells and of a "pump and treat" system to decontaminate the groundwater. In response to these measures, in October 1989, SCSC contacted Allied and Tower and requested reimbursement for past costs and payment of future costs associated with the perc cleanup. Although the parties dispute whether SCSC provided the insurers with sufficient information to invoke coverage and hence, the duty to defend, it is undisputed that SCSC sent both Allied and Tower letters dated October 6, 1989, notifying the insurers of the MPCA actions and requesting indemnification.

Following this notice, SCSC and Allied exchanged a series of letters and information. Despite SCSC's explicit requests, and despite Allied's indication to SCSC that it was conducting an investigation, Allied did not take a coverage position. Allied now asserts that this refusal was grounded on its belief that "no 'allegations' were referenced nor facts presented which claimed that property damage existed during Allied's policies, that there was an occurrence under the policies, or that such alleged occurrence was a cause of the remediation costs at issue." On March 27, 1990, the MPCA issued a Request for Response Action ("RFRA") that required SCSC to take specific action to remediate the site. The RFRA indicated that SCSC's failure to comply would permit the MPCA either to undertake the response action and seek reimbursement from SCSC for all costs of such action, to initiate an action to compel performance or to enjoin a release or a threatened release of hazardous substances from the site. In either case, the MPCA could seek a civil penalty of up to $20,000 per day for each day SCSC failed to take the requested action.

In October 1990, after incurring significant costs in responding to the MPCA's RFI and RFRA, SCSC commenced an action in Hennepin County District Court against Allied and Tower seeking declaratory and compensatory relief. SCSC sought a determination of the insurers' obligations under the liability insurance policies each insurer issued to SCSC. Following discovery, but prior to trial, SCSC, Allied and Tower each moved for summary judgment. On August 17, 1992, the district court denied summary judgment on all issues relevant to this appeal.

While trial was pending, SCSC continued to pay its environmental consulting firm for

the remediation costs. By May 1991, however, SCSC was no longer able to pay these costs. At that time, the MPCA moved to allocate state funds for the remediation. By June 1991, the MPCA contracted with outside companies to operate the treatment system and to conduct additional investigations. At the time of trial, the MPCA sought reimbursement for nearly $186,000 in costs it had incurred. An MPCA hydrogeologist estimated that the total past and future costs to the MPCA would be just over $1 million.

At trial, SCSC's hydrogeologist, Keith Rapp, testified that the concentration pattern of perc in the groundwater under and downgradient of the SCSC site was not consistent with a routine, continuous spilling or "drippage." Rapp testified that, instead, the contamination profile suggested one or two times when perc entered the soil in high concentrations. Rapp's testimony was consistent with the testimony of SCSC employees and drivers who indicated that the perc drippings noted by Zimmer on the RFI response likely were not the cause of the contamination because such drippings were regularly caught in five gallon buckets placed under the fill pipe during delivery.

On April 2, 1993, following a 16–day trial, the jury returned a verdict in favor of SCSC. Based on testimony that a significant spill occurred in August 1977, the jury concluded on the special verdict form that property damage arose in August 1977, as the result of an unintended, unexpected, sudden and accidental event, and that the damage was neither divisible nor attributable to an overriding cause. Further, the jury found that the reasonable cleanup costs to date was $486,294.41 and that the reasonable future cleanup costs would be $840,000.00. Pursuant to this verdict, the district court issued Findings of Fact, Conclusions of Law and an Order for Judgment against Allied and Tower on April 12, 1993.

All parties made post-trial motions, and on July 1, 1993, the trial court issued an amended order, reaffirming the jury's findings and concluding that every Allied and Tower policy in effect during and after August 1977 was triggered "vertically" with respect to both indemnification and the duty to defend.

Further, the court ordered a total judgment of $996,017.90 against Allied. This included $100,000 in remediation costs, reasonable attorney fees including a 1.5 multiplier, and additional costs, disbursements and interest through April 12, 1993. The court also ordered judgment against Tower for remediation costs of $386,294.41.

Allied and Tower appealed to the court of appeals, which affirmed in all respects except the enhanced portion of the attorney fees award. *SCSC Corp. v. Allied Mut. Ins. Co.,* 515 N.W.2d 588 (Minn.App.1994), *pet. for rev. granted* (Minn., June 29, 1994).

II.

Allied first argues that the trial court erred in denying Allied's motion for summary judgment because the facts alleged by SCSC were insufficient to establish a genuine issue of material fact. Specifically, Allied asserts that SCSC failed to prove: (1) property damage prior to 1981 or an actual injury during the policy periods; (2) policy coverage by Allied at that time; and (3) an occurrence in the form of an accident or a continuous and repeated exposure to conditions. Although Allied acknowledged that SCSC did submit affidavits in opposition to summary judgment, Allied argues that these statements were too speculative and too ambiguous to create a genuine fact issue.

Prior to the summary judgment hearing, SCSC submitted several affidavits and considerable documentary evidence. As evidence of property damage, SCSC submitted the affidavit of Keith Rapp, a hydrogeologist with Delta Environmental Consultants, Inc. Based on his observations from participating in the SCSC site investigation and cleanup, Rapp opined that the groundwater under SCSC had been contaminated with perc some time prior to April 1981. SCSC also submitted an affidavit of Irving Schloff, the owner and president of SCSC, stating that the company was required to pay for investigation and remediation costs associated with the MPCA's detection of perc contamination under the site. Further, as evidence of an occurrence covered under the policies, SCSC submitted an affidavit of Richard Anderson, a former SCSC bookkeeper. In that affida-

vit, Anderson stated that an accidental spill of at least five gallons of perc occurred some time after 1976 but before 1982 and involved a SCSC truck driver named Frank Marconi. Finally, as evidence of policy coverage, SCSC provided various documents relating to primary coverage for the period 1976–1984 and relating to umbrella coverage for the period 1982–1984.

Although Allied argues that the affidavits were too speculative to create a genuine issue of material fact, each affidavit recited specific facts based on the personal knowledge of the affiant. Even if Allied's concerns regarding conflicts between Richard Anderson's affidavit and his earlier deposition statement are warranted, conflicts in testimony are matters for the jury in determining the weight and the credibility to be given to the testimony. *Grant v. Malkerson Sales, Inc.*, 259 Minn. 419, 422, 108 N.W.2d 347, 350 (1961).

We conclude that the trial court did not err in denying Allied summary judgment.

## III.

Allied also presents three issues with respect to SCSC's burden of proof at trial: (1) whether SCSC met its initial burden of proof to establish its prima facie case of coverage under the policies; (2) which party bears the burden of proof to show an exception to the policies' qualified pollution exclusion clause; and (3) which party bears the burden of proof to show whether damages were the result of an overriding cause.

Allied first argues that SCSC did not meet its initial burden of proof to establish its prima facie case of coverage. Specifically, Allied contends that, although the primary policy language required SCSC to show two separate causal links, the trial court presumed one of these links. As a result, Allied

asserts that the court relieved SCSC of its burden to establish a necessary element of its prima facie case for coverage. We disagree.

■ In an action to determine coverage, the initial burden of proof is on the insured to establish a prima facie case of coverage. *Boedigheimer v. Taylor*, 287 Minn. 323, 329, 178 N.W.2d 610, 614 (1970). What constitutes a prima facie showing of coverage depends on the language of the particular policy. The policy must be read as a whole, and unambiguous language must be accorded its plain and ordinary meaning. *Henning Nelson Constr. Co. v. Fireman's Fund Am. Life Ins. Co.*, 383 N.W.2d 645, 652 (Minn.1986).

■ Pursuant to its primary policies with SCSC, Allied agreed to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of * * * property damage to which this insurance applies, caused by an occurrence * * *."[1] Therefore, the first causal link of the policies required SCSC, as the insured, to establish that it suffered "damages because of * * * property damage." This language requires the insurer to pay all damages causally related to an item of property damage under the policy definitions. *Federated Mut. Ins. Co. v. Concrete Units, Inc.*, 363 N.W.2d 751, 757 (Minn.1985), *reh'g denied* (Minn., March 29, 1985). The second causal link of the policies required SCSC, as the insured, to establish that the property damage was "caused by an occurrence." Under the terms of the policies, an "occurrence" is defined as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured * * *."

---

1. Under its excess liability policies with SCSC, Allied agreed

   [T]o indemnify the insured against such ultimate net loss in excess of the insured's primary limit as the insured sustains by reason of liability, imposed upon the insured by law or assumed by the insured under contract, for damages because of personal injury or property damage to which this policy applies, caused by an occurrence anywhere in the world.

   "Ultimate net loss" is defined in the policies as "the total sum which the insured, or any company as his insurer, or both, become obligated to pay as damages * * * because of personal injury or property damage, either through adjudication or compromise with the written consent of the Company."

With respect to causation, the trial court instructed the jury in part:

Under each policy, Allied and Tower agreed to pay all sums which Schloff Chemical became obligated to pay because of property damage to which the policies—policy applies[,] caused by an occurrence.

\*   \*   \*   \*   \*   \*

In order to trigger insurance coverage, Schloff Chemical must have shown by the greater weight of the evidence that an *event or events happened at the Schloff Chemical site which directly caused property damage* during the periods covered by Tower's and Allied's insurance policies. Subject to the terms, conditions, and limitations of the insurance policies, *contamination of an aquifer is a type of property damage* possibly covered under the policies issued by Allied and Tower to Schloff Chemical.

You will determine if or when property damage happened at the Schloff Chemical site. If you determine that property damage has arisen, *you must also determine whether the property damage resulted from a—an event or events at Schloff Chemical*—at the Schloff Chemical site.

A direct cause is a cause which has a substantial part in bringing about the property damage, either immediately or through happenings which follow one after another. If two or more events cause property damage, each event may be considered a direct cause of the contamination.

\*   \*   \*   \*   \*   \*

*You must determine the total costs or expenses paid or owed or payable in the future by Schloff Chemical as a result of property damage* regardless of your answers to the other questions on the verdict form. Included in your total should be all costs and expenses reasonably necessary to clean up the aquifer contamination.

Determination of damages must not be based upon speculation or guess. *Schloff Chemical must show by the greater weight of the evidence that the nature and amount of the costs are reasonably related to the aquifer cleanup.* Costs and expenses are reasonably related if they are or will be incurred or owed as costs involved in the cleanup of the aquifer or those actions taken to prevent, minimize, or eliminate the release of perc in order to protect the public health, welfare, or environment of the State of Minnesota.

(emphasis added). The corresponding questions on the Special Verdict Form and the jury's answers follow:

7. Was property damage arising prior to 10/10/84 caused by a sudden and accidental event or events?

YES    X

NO    _____

\*   \*   \*   \*   \*   \*

14. What is the total amount of reasonable costs and expenses incurred to date associated with the cleanup of the aquifer at the Schloff Chemical site?

Answer:   $486,294.41

15. What is the total amount of costs and expenses which will be reasonable [sic] certain to arise in the future associated with the cleanup of the aquifer at the Schloff Chemical site?

Answer:   $840,000

Allied argues that these instructions presumed the existence of the "damages"/"property damage" causal link, and SCSC therefore failed to establish that element of its prima facie case. Allied contends this error entitles it to a new trial. Allied's concern seems to arise from the fact that the trial court did not dedicate a separate jury instruction and a separate question on the special verdict form to this causation element. We do not share Allied's concern.

■ The trial judge has broad discretion regarding the form and substance of special verdict questions. *Gravley v. Sea Gull Marine, Inc.,* 269 N.W.2d 896, 900 (Minn.1978). When fact questions exist regarding the interpretation and the construction of an insurance policy, it is the trial court's function to instruct the jury as to the meaning of the policy terms. *Auto-Owners Ins. Co. v. Jensen,* 667 F.2d 714, 717 (8th Cir.1981) (applying Minnesota law) (citing *Farmers Ins.*

*Exch. v. Sipple*, 255 N.W.2d 373 (Minn. 1977)).

In this case, the trial court included the "damages"/"property damage" causal link in its instructions regarding the costs and expenses SCSC incurred cleaning up the site, and it instructed the jury that it must determine the total costs and expenses "owed or payable in the future by Schloff Chemical *as a result of* property damage" (emphasis added). Further, the trial court incorporated the instructions on the "damages"/"property damage" link into questions 14 and 15 on the special verdict form, asking for the total amount of past and future costs "associated with the cleanup of the aquifer at the Schloff Chemical site[.]" We conclude that neither the manner in which the trial court instructed the jury nor the form of the questions on the special verdict form relieved SCSC of its burden of proving that it suffered "damages because of * * * property damage to which this insurance applies, caused by an occurrence * * *."

■ Moreover, we believe that the "damages because of * * * property damage" causal link is established as a matter of law when the expenditures constituting the damages are mandated by the MPCA. In *Minnesota Mining & Mfg. Co v. Travelers Indem. Co.*, this court interpreted coverage language identical to the language in the present case. 457 N.W.2d 175, 184 (Minn. 1990). The court held that "expenditures mandated by the Minnesota Pollution Control Agency pursuant to the Minnesota Environmental Response and Liability Act, Minn. Stat. ch. 115B, which are necessary to effectuate the cleanup of contamination which has already occurred to the state's water resources, are 'damages because of * * * property damage' within the meaning of the comprehensive general liability insurance policies issued by these defendants." *Id.* It is sufficient, then, that SCSC showed it incurred the damages pursuant to the MPCA's request.

Allied next raises the issue of who bears the burden of proof with respect to the operation of the qualified pollution exclusion

clause in the Allied/SCSC policies. The exclusion clause provides:

> This insurance does not apply * * * to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental[.] [2]

■ In an action to determine insurance coverage, once the insured has established a prima facie case of coverage, it "is entitled to go to the jury * * *." *Boedigheimer*, 287 Minn. at 329, 178 N.W.2d at 614. If the policy contains an exclusion clause, the burden then shifts to the insurer to prove the applicability of the exclusion as an affirmative defense. *Id.*; *Hubred v. Control Data Corp.*, 442 N.W.2d 308, 310 (Minn.1989). *See also Milwaukee Mut. Ins. Co. v. City of Minneapolis*, 307 Minn. 301, 307, 239 N.W.2d 472, 475 (1976); *L.F. Bolduc v. New York Fire Ins. Co.*, 244 Minn. 192, 197–98, 69 N.W.2d 660, 665 (1955). It is not the insured's obligation to show that the exclusion has become operative. *Id.* Exclusions are narrowly interpreted against the insurer. *Bob Useldinger & Sons, Inc. v. Hangsleben*, 505 N.W.2d 323, 327 (Minn.1993), *reh'g denied* (Minn., Oct. 7, 1993); *Atwater Creamery Co. v. Western Nat'l Mut. Ins. Co.*, 366 N.W.2d 271, 276 (Minn.1985), *reh'g denied* (Minn., May 20, 1985).

■ Allied argues that once the insurer makes the requisite showing of an exclusion, the burden of proof shifts back to the insured to show the applicability of the "sudden and accidental" exception to the pollution exclusion. We agree. Some courts, including the Minnesota Court of Appeals, have required the *insurer* to disprove the application of an exception to the exclusion because the insurer's burden to prove the exclusion incorporates this secondary burden to prove

2. The excess liability policies between SCSC and Allied contained an identical qualified pollution exclusion clause.

the exception. *See Dakhue Landfill, Inc. v. Employers Ins. of Wausau*, 508 N.W.2d 798, 802 (Minn.App.1993) (citation omitted). We reject this approach. We hold that once the insurer shows the application of an exclusion clause, the burden of proof shifts back to the insured because the exception to the exclusion "restores" coverage for which the insured bears the burden of proof. Moreover, the insured is in a better position to obtain information regarding whether the release was "sudden and accidental." *See Fischer & Porter Co. v. Liberty Mut. Ins. Co.*, 656 F.Supp. 132, 140 (E.D.Pa.1986). Applying this burden shifting analysis to the present case, we conclude that SCSC had the burden to show an "occurrence" in order to trigger coverage. Allied then bore the burden to show the applicability of the pollution exclusion. Once Allied showed the applicability of the exclusion, the burden of proof shifted back to SCSC to show the applicability of the "sudden and accidental" exception to the pollution exclusion. Clearly, the jury's finding that the damage arose from a sudden and accidental event established that SCSC met its burden to show the applicability of the exception to the pollution exclusion.

Finally, Allied argues that because the jury found no overriding cause, SCSC failed to meet its burden of proof on causation. We disagree. Demonstrating that an overriding cause, not covered under the provisions of a policy, caused the alleged damages is an affirmative defense available to the insurer, rather than a prima facie requirement for the insured. *See Henning Nelson Constr. Co.*, 383 N.W.2d at 653; *Campbell v. Insurance Serv. Agency*, 424 N.W.2d 785, 789 (Minn.App.1988). Because proof of an overriding cause is an affirmative defense, the insurer bears the burden to show that an excluded cause was the overriding cause of the damages even if other covered causes contributed.

Placing on the insurer the burden to prove an overriding cause is consistent with the requirement that the insured need only show that one covered cause was a direct cause. *Henning Nelson Constr. Co.*, 383 N.W.2d at 653. For example, if testimony shows ten direct causes, but the insured shows that only one of these is a covered cause, the insured has met its burden of proof. *Id.* Coverage is not defeated simply because a separate excluded cause contributes to the damages. *Id.* If the insurer asserts that a noncovered or excluded cause was the true cause, the insurer cannot simply show that this noncovered or excluded cause is a direct cause; it must show something more than that. It is consistent, therefore, to require the insurer to show that the noncovered or excluded cause is the overriding cause—so much so that it overrides the insured's showing of a direct, covered cause. To allow any less of a showing would conflict with the principle that the insured need show only one direct, covered cause.

In this case, SCSC was not required to establish as part of its burden of proof that its damages resulted from a covered, overriding cause. Contrary to Allied's assertion, SCSC had to show only that its damages resulted from any cause covered under the policies. Moreover, based on the jury's finding that no overriding cause existed, it is clear that Allied did not meet its burden to show that a noncovered cause was the overriding cause of the damages.

## IV.

Allied next presents three issues with respect to its duty to defend SCSC. First, Allied argues that the trial court erred in holding that Allied and Tower had a joint and several duty to defend SCSC in all actions by the MPCA dating back to the time of the October 26, 1988 RFI letter. Allied asserts that it did not have a duty to defend SCSC at the time the MPCA issued the RFI because the RFI did not constitute a "suit" under the applicable policy provisions. Second, Allied argues that even if the RFI or the subsequent action taken by the MPCA amounted to a "suit," neither the language of the MPCA's correspondence with SCSC nor any of the information SCSC forwarded to Allied gave Allied reason to conclude the alleged "damages" were arguably within the coverage provided by the policies. Finally, Allied argues that even if it had a duty to defend SCSC, the trial court erred in awarding SCSC defense costs SCSC incurred before it

properly tendered its indemnity and defense request to Allied on October 6, 1989, one year after the issuance of the RFI.

Allied first argues that the RFI did not amount to a suit under the terms of its policies with SCSC, and therefore, Allied did not have a duty to defend SCSC at the time the MPCA issued the RFI. The applicable policy language provides:

> [Allied] will pay on behalf of [SCSC] all sums which [SCSC] shall become legally obligated to pay as damages because of [bodily injury or property damage] to which this insurance applies, caused by an occurrence, and [Allied] shall have the right and *duty to defend* any *suit* against [SCSC] seeking damages on account of such bodily injury or property damage, even if any of the allegations of the *suit* are groundless, false or fraudulent, and may make such investigation and settlement of any claim or *suit* as it deems expedient * * *.

(emphasis added.) Allied contends that although it had a duty to defend any "suit" against SCSC, an RFI is at most only a "claim" that does not invoke the duty to defend because it does not carry the threatening, coercive tone of a lawsuit. We disagree.

Whether an RFI issued by the MPCA constitutes a "suit" for purposes of the duty to defend under a CGL policy is an issue of first impression for this court. However, our decision in *Minnesota Mining & Mfg. v. Travelers Indem.*, 457 N.W.2d 175 (Minn. 1990) [hereinafter *"3M"*], provides some guidance on this issue. In *3M*, the United States District Court for the District of Minnesota certified questions to this court regarding the responsibility of insurers under CGL policies to indemnify their insureds for costs incurred in complying with directives issued by the MPCA and the EPA to clean up soil and groundwater contamination. *Id.* at 176–77. The insurers argued that the term "damages," as used in a CGL policy, referred only to monetary compensation the insureds are legally obligated to pay for injuries to a third party and did not include costs incurred in responding to state and federal environmental agencies. *Id.* at 178. We re-

jected that argument and held that such costs are covered "damages" within the meaning of a CGL policy.

Although we did not reach the related issue of what constitutes a "suit" under such a policy, it logically follows from both our analysis and our decision in *3M* that the term "suit," as used in a CGL policy, includes action taken by the MPCA in the form of an RFI. *See A.Y. McDonald Indus. v. Insurance Co. of N. Am.*, 475 N.W.2d 607, 626–29 (Iowa 1991) (citing *3M* and holding that EPA demand to clean up groundwater contamination is a "suit" under a CGL policy because a suit is "'an attempt to gain an end by legal process'") (quoting *Webster's Third New Int'l Dict.* 2286 (P. Gove ed. 1961); *Aetna Casualty & Sur. Co. v. Pintlar Corp.*, 948 F.2d 1507, 1516–17 (9th Cir.1991) (holding that a Potential Responsible Party letter issued by the EPA constitutes a "suit" because an "ordinary person" would perceive such a letter as notice of the "effective commencement of a 'suit' necessitating a legal defense").

Allied next argues that even if the MPCA's actions amounted to a "suit," SCSC failed to demonstrate prior to trial that its claims were arguably within the coverage provided by the policies. In its amended order, the trial court found that SCSC's October 6, 1989 letter to Allied informing it of the MPCA actions and requesting Allied to defend and to indemnify SCSC sufficiently informed Allied of SCSC's claim for property damage that was arguably within the policy coverage. We agree.

The duty to defend is distinct from and broader than the duty to indemnify. *Brown v. State Auto. & Casualty Underwriters*, 293 N.W.2d 822, 825 (Minn.1980). If any claim is arguably covered under a policy, the insurer must defend and reserve any arguments regarding coverage. *Id.* The insurer's obligation to defend is generally determined by comparing the "complaint" with the terms of the policy language. *Garvis v. Employers Mut. Casualty Co.*, 497 N.W.2d 254, 256 (Minn.1993). Any ambiguity regarding coverage is resolved in favor of the insured. *Prahm v. Rupp Constr. Co.*, 277 N.W.2d 389,

390 (Minn.1979). The burden is on the insurer to prove that it has no duty to defend. *Lanoue v. Fireman's Fund Am. Ins. Cos.,* 278 N.W.2d 49, 52 (Minn.1979), *reh'g denied* (Minn., May 9, 1979). If the insurer has no knowledge to the contrary, it may refuse to defend based on the facts alleged in the complaint. *Garvis,* 497 N.W.2d at 258. However, once the insured comes forward with facts showing arguable coverage, or the insurer becomes independently aware of such facts, the insurer must either defend or further investigate the potential claim. *Id.*

We conclude that the following facts show that SCSC clearly provided Allied with information sufficient to demonstrate arguable coverage. First, in a letter dated October 6, 1989, SCSC informed Allied that SCSC was "subject to claims by the [MPCA] alleging property damage to the State's natural resources" and gave Allied a background of the MPCA's actions and findings. Second, SCSC asked Allied to indemnify it for all costs incurred and to be incurred as a result of the alleged damage, including investigation and defense costs. Finally, SCSC provided Allied with relevant policy numbers and stated that "[i]t is possible that the soil and groundwater contamination alleged by the MPCA began and continued throughout the coverage period of Allied's policies." This letter clearly gave Allied sufficient information to conclude that SCSC had presented a claim for arguable coverage under its policies with Allied. At a minimum, this information required Allied to investigate SCSC's claims and to provide SCSC with a coverage position.[3]

Finally, Allied argues that this court should reverse the award of attorney fees that SCSC incurred before it properly tendered to Allied its defense request. The trial court held that Allied and Tower are jointly and severally liable for all defense costs incurred both before and after SCSC provided Allied and Tower with notice of the MPCA's claims. The court of appeals affirmed. 515 N.W.2d at 600.

An insured may recover from its insurer attorney fees that the insured has incurred defending itself against claims by a third party when the insurer has a contractual duty to defend the insured, but has refused to do so. *See Jostens, Inc. v. Mission Ins. Co.,* 387 N.W.2d 161, 167 (Minn.1986), *as amended on denial of reh'g* (Minn., May 12, 1986). Generally, however, the formal tender of a defense request is a condition precedent to the recovery of attorney fees that a party incurs defending claims that a third party is contractually obligated to pay. *See Hill v. Okay Constr. Co., Inc.,* 312 Minn. 324, 346, 252 N.W.2d 107, 121 (1977) (citing *Sorenson v. Safety Flate, Inc.,* 306 Minn. 300, 235 N.W.2d 848 (1975)).

In the present case, the MPCA contacted SCSC by letter, dated October 26, 1988, informing it of the discovered groundwater contamination and requesting SCSC to complete an RFI. SCSC fully cooperated with the MPCA and hired an engineering firm to assist in its investigation and remediation responsibilities. However, SCSC did not inform Allied of the MPCA's actions until October 6, 1989, when it formally requested in a letter to Allied "that Allied indemnify [SCSC] for the liabilities [SCSC has] incurred and will incur in connection with the MPCA's property damage claims, including all sums associated with the investigation,

---

**3.** Allied also asserts that it did not have a duty to defend SCSC because the MPCA's "damages" were wholly outside the scope of the policies by operation of the pollution exclusion clause. At no time before trial, however, did Allied inform SCSC that the pollution exclusion barred either SCSC's indemnity request or its defense request. Allied specifically told SCSC in a letter dated May 2, 1990, that Allied was investigating the claim. SCSC asked Allied on several occasions to state a coverage position, but at no time did Allied comply. Once SCSC came forward with facts showing arguable coverage, as we conclude it did in the October 6, 1989 letter, Allied had to either defend SCSC in the MPCA actions or further investigate SCSC's claim. *Garvis,* 497 N.W.2d at 258. If Allied had investigated SCSC's defense request and had concluded that the pollution exclusion barred coverage, it was Allied's responsibility to communicate this conclusion to SCSC so that SCSC could have the opportunity to provide Allied with further information. In this case, Allied failed either to inform SCSC of its belief that the pollution exclusion applied or to provide a coverage position. Under these circumstances, Allied cannot now rely on its prior silence to defeat its duty to defend.

defense and resolution of these claims." Although we have concluded that Allied had a duty to defend SCSC from the time the MPCA issued the RFI, SCSC did not invoke this duty until it properly tendered its defense request in the October 6, 1989 letter. We therefore reverse the award of attorney fees that SCSC incurred prior to October 6, 1989 and remand to the district court with directions to determine what portion, if any, of the trial court's award of attorney fees were incurred prior to October 6, 1989.

## V.

Appellant Tower Insurance Company presents two issues with respect to the trial court's allocation of the damage award. First, Tower argues that the trial court erred because the special verdict form it submitted to the jury asked the jury to state only the "date" upon which property damage arose. Tower is apparently concerned that the jury was not given the opportunity to account for any post–1977 spills in its damage allocation. Second, Tower argues that the trial court should have allocated the damages by using a "pro rata by time on the risk" allocation method, and should have allocated damages to SCSC for uninsured years.

Tower first argues the trial court should have given the jury the opportunity to state multiple dates upon which property damage arose. The special verdict form asked the jury to state the singular date upon which property damage arose. The form also asked the jury to state whether the damage was divisible among any of the policy or post-policy years. Based on these questions, the jury found that property damage arose at the SCSC site in 1977 and that the damages were not divisible for any of the policy or post-policy dates. The trial court held that the special verdict form was the proper form because any prejudice to Tower resulting from the single date question was cured by allowing the jury to state whether the damages were divisible. The court of appeals agreed. 515 N.W.2d at 597. We also agree.

▮ Generally, the trial judge has broad discretion regarding the form and substance of special verdict questions. *Gravley v. Sea Gull Marine, Inc.*, 269 N.W.2d 896,

900 (Minn.1978). In this case, the trial court gave the jury the opportunity to divide the property damage among the applicable policy periods. The jury found that the damages were not divisible. Moreover, as the court of appeals noted, there is no evidence in the record to indicate that any later, post-policy additions of perc to the groundwater increased cleanup costs. 515 N.W.2d at 597. On these facts, we cannot conclude that the trial court's special verdict form prejudiced Tower.

▮ Tower also argues that the trial court's policy triggering and damage allocation schemes were erroneous. The trial court chose to trigger the policies "vertically," by year, beginning with the policies in effect in 1977. Allied's 1977 $100,000 limit was triggered first, and once that was exhausted, Tower's 1977 $1,000,000 excess policy was triggered. This is what is known as a "vertical trigger" scheme.

Tower argues that this court should adopt the "pro rata by time on the risk" theory of allocation first used by this court in *Northern States Power Co. v. Fidelity & Casualty Co. of N.Y.*, 523 N.W.2d 657, 663–64 (Minn.1994) [hereinafter "*NSP*"]. According to Tower, this would involve allocating proportional damages to Allied for all the years its primary policies were on the risk. Under this scheme, Tower's excess policies would be triggered proportionally, for the years its was on the risk, only after Allied's primary policy limit of $100,000 per year is exhausted for all apportioned policy years. This would be a "horizontal trigger" of the primary and excess policies.

The issue before us in *NSP* was how to allocate damages consistent with the actual injury rule in an environmental contamination case in which property damage had occurred undetected over a long period of time and in which multiple insurance companies were on the risk in varying years. We opted, under the facts of *NSP*, to allocate damages pro rata by each insured's "time on the risk." 523 N.W.2d at 662. Under this trigger method, each insurer is proportionally liable only for the damages that occur in the policy years in which the insurer was on the

risk. For example, if property damage occurs continuously for 10 years, $\frac{1}{10}$ of the damage would be allocable to a policy that was on the risk for one year, and $\frac{3}{10}$ of the damages would be allocable to a policy that was on the risk for 3 years. *Id.* at 664. The advantage of this method was that it reduced the costs of litigation because it was a per se rule. We noted that this method "assumes that the damages in a contamination case are evenly distributed (or continuous) through each policy period from the first point at which damages occurred to the time of discovery, cleanup or whenever the last triggered policy period ended." *Id.* at 663. Although in *NSP* we adopted a "pro rata by time on the risk" trigger method for continuous groundwater contamination cases, we also noted that trial courts must be given flexibility in apportioning damages "in a manner befitting each case." 523 N.W.2d at 663.

Under the facts of the present case, we reject the multiple-year vertical triggering approach taken by the trial court. We also decline Tower's invitation to apply *NSP*'s pro rata by time on the risk triggering approach. In *NSP*, the damages occurred over multiple policy periods, and without evidence to the contrary, we concluded that such damages must be assumed to be continuous. Our decision in *NSP* was an equitable decision based upon the complexity of proving in which policy periods covered property damage arose. In the present case, however, we have sufficient evidence indicating that the damage arose from a single event in 1977. The jury found that the damage was not divisible and that it was the result of a sudden and accidental occurrence. Based on these findings, the only covered "occurrence" was the 1977 spill. The continual leaching of the chemicals from the soil into the groundwater did result in damages to SCSC because of property damage. However, only Allied's 1977 $100,000 primary policy and Tower's 1977 $1,000,000 excess policy are triggered. Damages in excess of the $1,100,000 aggregate limit of the primary and excess policies on the risk in 1977 are not

covered. This result is consistent with the actual injury theory.

We reverse the decision of the trial court to the extent that it allocates damages to Tower and Allied for primary and excess policies that were not on the risk in 1977.

## VI.

Finally, SCSC argues that the court of appeals erred in rejecting the trial court's award of enhanced attorney fees pursuant to SCSC's contingency agreement with its attorneys. The trial court found not only that SCSC was entitled to enhanced attorney fees, but also found that a 50% enhancement was necessary to fully compensate SCSC's attorneys even though SCSC's contingency fee agreement provided for only a 25% enhancement. The trial court found that given the reasonableness of the hours billed, the complexity of the case, and the "undesirability" of coverage cases, SCSC's attorneys would not be doubly compensated by using a 1.5 multiplier. Moreover, the trial court found that SCSC's attorneys would not be fully compensated by an award of Lodestar fees alone.[4]

The court of appeals reversed the award of enhanced attorney fees. It noted that although public policy favors providing a fee enhancement as an incentive to private attorneys who bring civil rights lawsuits, no similar policy exists in insurance coverage actions. 515 N.W.2d at 603. The court of appeals went on to hold that although the base attorney fees sought were reasonable and necessary, the enhanced portion of the award was erroneous. *Id.* We agree.

Attorney fees are recoverable in a declaratory judgment action only if there is a breach of a contractual duty or statutory authority exists to support such recovery. *Morrison v. Swenson,* 274 Minn. 127, 137–38, 142 N.W.2d 640, 647 (1966). In this case, recovery is premised on Allied's breach of its contractual duty to defend. *See Lanoue,* 278 N.W.2d at 55 (stating that "the insured will not be

---

4. The Lodestar figure is calculated by multiplying the number of hours reasonably expended on the litigation by the reasonable hourly rate.

*Anderson v. Hunter, Keith, Marshall & Co.,* 417 N.W.2d 619, 628 (Minn.1988).

required to pay the litigation costs of forcing the insurer to assume that burden").

SCSC is entitled to recover reasonable attorney fees it incurred bringing its declaratory action, but we reverse the award of the enhanced portion of those fees.

Affirmed in part, reversed in part and remanded.

ANDERSON, J., took no part in the consideration or decision of this case.